# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**SANDRA BRAVO,**

    *Plaintiff,*

**v.**                                                             **Case No. 5:22-CV-1186-JKP**

**FRANK KENDALL, SECRETARY,**
**DEPARTMENT OF THE AIR FORCE,**

    *Defendant.*

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are two motions: (1) Defendant's Motion for Summary Judgment (ECF No. 52) and (2) Plaintiff's Motion to Strike (ECF No. 62). With Plaintiff's sealed response (ECF No. 56) and Defendant's reply (ECF No. 60), the motion for summary judgment is fully briefed and ready for ruling. The motion to strike is also fully briefed with Defendant's response (ECF No. 64); Plaintiff's reply (ECF No. 70), as well as a notice regarding witness statement (ECF No. 63); a supplement to the motion (ECF No. 66); a supplement to the response (ECF No. 65); and an exhibit to the reply (ECF No. 69). After considering the motions, related briefing, relevant pleadings, submitted evidence,[1] and applicable law, the Court grants the motion for summary judgment and denies the motion to strike.

---

[1] Defendant has submitted two exhibits with his motion: (1) an Affidavit of Chantel A. Smith (ECF No. 52-1) and (2) an EEO Counselor's Report (ECF No. 52-2). He also relies on exhibits provided with prior summary judgment briefing. *See* ECF Nos. 22-1 to 22-10.

Plaintiff has submitted numerous exhibits with her response. *See* ECF Nos. 56-1 through 56-13. These summary judgment exhibits from Plaintiff commence with Exhibit 96 and end with Exhibit 108. Plaintiff, however, also cites to exhibits preceding Exhibit 96. Because she provided Exhibits 1 to 90 with previous summary judgment briefing, *see* ECF No. 32-3, the Court will rely on those exhibits when her current submissions fail to include a cited exhibit. Because Plaintiff's response states that Exhibits 1 through 95 "are included in the docket from previously submitted files in October and November 2023," *see* ECF No. 56 at 34, the Court was able to locate Exhibits 91 through 95 as added at the end of her Brief (ECF No. 36), not as separate attachments, but starting on page thirteen following her conclusion to the brief.

For ease of reference, the Court will cite to the parties' submissions by ECF document and page numbering, while sometimes including the exhibit number. To the extent the parties rely on other documents provided in this case, such

# I. BACKGROUND[2]

Plaintiff served active duty in the Air Force ("AF") from February 1990 to April 1996. ECF No. 32-3 at 8. She suffers from lumbar spine intervertebral disc disease with degenerative arthritis (hereinafter "back impairment"). *Id*. at 220. As of February 25, 2010, the VA assigned 20% disability for the back impairment and another 10% for gastroesophageal reflux disease. *Id*. at 221. As of that same date, another medical record shows 10% assigned disability for plantar fasciitis in each foot. *Id*. at 222. And another medical record shows a 50% assigned disability (effective date February 15, 2010) for a major depressive disorder with anxious distress and panic attacks. *Id*. at 223. An annual physical of August 16, 2010, noted a prior back surgery and generalized anxiety disorder. *Id*. at 225. An examination of August 17, 2010, noted that she was in pain management, her back discomfort was "much improved," and her generalized anxiety disorder and reflux disease were doing well. *Id*. at 241.

As of February 9, 2011, her "VA Benefits" showed she had a service-connected disability, with a combined service-connected evaluation of 30%. *Id*. at 8. Effective September 28, 2011, the assigned percentage for the back impairment was increased to 60%. *Id*. at 222. On November 16, 2011, she underwent musculoskeletal imaging. *Id*. at 224, 273.

On February 2, 2012, the Department of Veterans Affairs ("VA") certified her as "an individual with a severe physical, intellectual, or psychological disability that qualifies her for consideration under . . . Schedule A hiring authority, appointment of Persons with Disabilities." *Id.* at 5.

---

as the numerous attachments to Plaintiff's complaint (ECF No. 10), the Court will also utilize the ECF document and page numbering. Some exhibits submitted by Plaintiff are not summary judgment evidence but rather aggregation of unsupported contentions, arguments, comments, or beliefs of Plaintiff. To the extent such exhibits are or appear uncontested, the Court may rely on them despite their evidentiary failings. Nevertheless, "unsubstantiated assertions are not competent summary judgment evidence," *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), and the Court will not rely on them.

[2] The factual background is uncontested unless otherwise noted. The Court considers disputed facts in the light most favorable to the non-movant as required through the summary judgment process. Given the pro se status of Plaintiff, the Court stresses that her subjective beliefs, contentions, and arguments are not evidence and are insufficient to create a factual dispute.

Effective March 13, 2012, the VA assigned 30% disability for migraine headaches. *Id.* at 222. In a Statement of the Case dated May 4, 2012, the VA continued to recognize Plaintiff's various physical impairments (back, foot, and headaches) while denying any service connection for any anxiety disorder or depression. ECF No. 56-11 at 1 (Ex. 106). It later granted the service connection, effective February 25, 2010, for: "Major depressive disorder (MDD) with anxious distress and panic attacks (claimed as anxiety disorder and depression)." ECF No. 32-3 at 245. Plaintiff provides an undated combined disability rating calculator offered by the VA, which shows a "VA disability rating" of 80%. *Id.* at 243.

## A. August 2012 and Overview of Intern Program

Plaintiff was accepted into the Air Force Intern Program (Copper Cap) as a Contract Specialist and began her internship on August 13, 2012. *Id.* at 2, 9. Her chain of command included four levels of supervisors and a team leader, Gary Beck.[3] *See* ECF No. 10 at 33. Her first-level supervisor was her Flight Chief, Chantel Smith. *Id.* Her second-level supervisor was John McLaurin, the Copper Cap Program Manager. *Id.* (misidentifying him as Gary McLaurin). Her third-level supervisor was Maria Beckett, and her fourth-level supervisor was John Lamoureux, Commander of the 502 MSG. *Id.*

Smith knew of Plaintiff's "claim to a disability before she was hired" based upon "a list of schedule A candidates which [Smith] assumed were persons who had a disability." *Id.* at 286. But the received information "did not provide specifics about her disability." *Id.*

The purpose of the Copper Cap intern program, formally known as "Copper Cap Training Plan (Rotational OJT)," is to "outline a three-year, three-prong approach governing rotation

---

[3] At the time of Plaintiff's complaints, Beck was initially employed as Team Lead with Smith as Plaintiff's supervisor. *See* ECF No. 22-2 at 1. When Smith "was reassigned to another flight" in late January 2013, he "became the interim first line supervisor for [Plaintiff]." *Id.* He and Plaintiff were on the same team until she resigned. *Id.*

through the squadron, formal training and on the job training." ECF No. 22-1 ¶ 1.[4] The program

mandates an initial 90-day feedback and quarterly meetings for at least the first twelve months. *Id*.

¶ 8. The rotation plan "creates an opportunity in which interns will become proficient in the ma-

jority of skills required to provide excellent customer support in compliance with all applicable

acquisition guidance." *Id*. ¶ 4. Three components comprise the intern on the job training ("OJT")

rotational program: (1) formal education as described in ¶ 2, (2) proficiency, and (3) job experi-

ence. *Id*. ¶ 3. "Interns will gain needed experience while working hand and hand with his or her

assigned trainer." *Id*. The OJT program's main objective "is to learn by doing." *Id*.

       Formal training is through the Defense Acquisition University ("DAU"), "the governing

body that develops and implements training and certification standards for all acquisition person-

nel within the Department of Defense" ("DOD"). *Id*. ¶ 2. This training "is a critical component for

intern development." *Id*. Formal training includes "in-residence courses" and "on-line training."

*Id*. Because "[f]ormal training and class attendance takes priority over the unit's mission . . . Flight

Chiefs and the intern should ensure coverage during absences for in residence training." *Id*. (omit-

ting bold). Furthermore, "[o]n-line training will be accomplished at the work site as much as pos-

sible," but "[t]o ensure and promote a healthy learning environment, the intern may accomplish

the on-line training at locations other than the worksite (e.g. Base Library) upon approval before-

hand by his or her Flight Chief." *Id*.

       In an unsworn summary timeline regarding her request for chair accommodation, *see* ECF

No. 32-3 at 26–31 (Ex. 15),[5] Plaintiff states that during her new employee in-brief, she requested

an ergonomic chair as a reasonable accommodation from Smith. *Id*. at 26. According to Plaintiff,

---

[4] Plaintiff submitted the first page of this document as Exhibit 91 with her own annotations. *See* ECF No. 36 at 13. Except when addressing an annotation, the Court finds the full document to be the better source to cite.

[5] While timeline summaries can be quite helpful, they must be properly supported with evidence. Unsupported asser-tions, improbable inferences, and speculative beliefs are not helpful.

Smith stated that Plaintiff "would be required to provide a physician's letter identifying medical necessity for the purchase of chair" and also stated that "there was presently no funding available." *Id*. Although Plaintiff contends that, after she "explained the extent of her lower back condition and the use of narcotics and other medications" then prescribed for the condition, Smith reiterated a "lack of funding," *id*., Plaintiff points to no evidentiary support for such contention.

During the new employee in-brief, Smith completed a form titled "Supervisor Checklist for Job Induction" (hereinafter referred to as the checklist). *See id.* at 9, 286. Plaintiff and Smith reviewed the checklist and signed the form on August 14, 2012. *Id*. at 10, 286. Two checklist items are relevant to this case. Paragraph 6 of Section I titled, "Get Ready to Receive the New Employee," directs supervisors:

> Verify employee's ability to perform duties of the position, particularly those jobs requiring heavy physical activity such as lifting, bending, stooping, climbing, also extreme exposure to heat/cold and persons with hearing problems. If there is previous history of back injury, hearing problems, and the record so indicates, DO NOT ASSIGN TO DUTY until AF medical evaluation is received outlining physical limitations, if any.

*Id*. at 9. Smith checked this item as complete. *Id*. And Paragraph 4 of Section V titled, "Layout of Shop or Office and Available Facilities," provides contingent direction: "If employee is handicapped and requires work site accommodations, discuss these and ensure accommodations are made; assign handicapped parking space to employees whose mobility is impaired." *Id*. With respect to this item, Smith marked "N/A." *Id*. Smith explained that she did so when Plaintiff "did not state she had special accommodations" when Smith asked about that item. *Id*. at 286.

Nevertheless, on the morning of August 14, 2012, Plaintiff emailed Elizabeth Tijerina, Program Manager for the Copper Cap Intern Program, stated that she had spoken with "Smith about purchasing a chair that helps with [Plaintiff's] lower back nerve problem," knows she "needs a physician's letter for it to be purchased," and asks whether she could purchase it and "be reimbursed by the program." *Id*. at 13. Two days later, Tijerina informed Plaintiff to "work with" Smith

5

on acquiring the chair rather than making a self-purchase hoping for reimbursement, because "there may not be a system in place to reimburse [Plaintiff] and there are probably certain approved vendors." *Id*. at 14.

Tijerina confirmed that Plaintiff sent her an email regarding an ergonomic chair on August 14, 2012. *Id*. at 285. She stated that the role of her office was "to recruit" interns—"We do not get involved in workplace personnel issues with the interns and do not intercede on an intern's behalf." *Id*. When McLaurin contacted her office, he was informed to instead contact Employee Management Relations ("EMR"). *Id*. Her office had "nothing to do with the procurement or purchase of the ergonomic chair," although sometime after Plaintiff's August 14 email, her office was "informed that the VA was supposed to provide her with the ergonomic chair." *Id*. To Tijerina's knowledge, her "office never heard anything" about the chair after the August 14 email, "except that Ms. Smith was trying to obtain" a chair and then they "were told that the VA was going to provide the chair." *Id*. Her "office could not provide funding for a chair." *Id*.

On August 21, 2012, the VA asked Plaintiff to complete a form that was needed before the VA could "make a worksite evaluation request on [her] behalf." *Id*. at 36 (Ex. 17). Plaintiff indicates that this was her initial request to the VA. *See id*. at 38 (Ex. 19, annotation). She provided a letter, dated August 21, 2012, from the VA that she "is followed at our office for chronic medical condition and needs an ergonomic chair lumbar adjustment for height and depth." *See id*. at 12 (identified by Plaintiff as a physician letter of medical necessity). Plaintiff states that she "hand-delivered the letter" to Smith, who placed it "in her inbox where it sat from August 22, 2012 until September 5, 2012." *Id*. at 27.

On August 30, 2012, Plaintiff commenced email correspondence with HR Specialist Tammy Lewis and stated that she was "considering resigning from [her] position." *Id*. at 178. Lewis first recommended a person for Plaintiff to discuss the matter before deciding. *Id*. at 177.

Plaintiff left a voice message for that person and emailed Lewis again stating that she "applied to use [some] sick leave [because] of sharp pain [she was] having at 10 am and wanted to leave midday," but she had not received a response, so she wanted to speak to Lewis about options. *Id*. She concluded that email with: "Maybe I can be placed somewhere else that can accommodate me and is not deliberately making things difficult." *Id*. After Lewis responded that "these are EMR issues" and said that her recommended contact would call her back, Plaintiff indicated that she did not "have anyone else to turn to" for her questions. *Id*. at 176.

**B. September 2012**

At 4:56 PM, on September 5, 2012, Smith directed James Coleman, Quality Assurance Program Coordinator, to purchase a chair for Plaintiff. *Id*. at 15. At 5:34 PM, on that date, Coleman responded: "Will purchase when I have funds." *Id*. at 16. At 7:05 PM, Plaintiff identified a chair that she had selected through Office Max. *Id*. at 15.

The next day, at 12:39 PM, Plaintiff sent an email to inform Smith and Coleman: "Disregard the chair. The VA called me and stated they will take care of me." *Id*. at 17; *see also*, *id*. at 28 (indicating that Plaintiff called the VA). There is no indication as to when either Smith or Coleman saw or responded to that email. But Smith averred that she informed Beckett of the email and Beckett "said we would still purchase the chair." ECF No. 52-1 at 2. Plaintiff states that she met with McLaurin that day at 2:51 PM to voice "her frustration over the management's constant" flux regarding the chair purchase and he assured her that "he would correct the oversight that was impeding the purchase of the chair and stated the purchase would be made." ECF No. 32-3 at 28. According to Plaintiff, McLaurin then spoke to Beckett about the matter. *Id*. At that point, Beckett emailed several recipients, including Smith, Coleman, and McLaurin, but not Plaintiff, about purchasing an ergonomic chair for Plaintiff. *Id*. at 18. She asked whether Chris Underwood would approve the purchase and transfer of funds into the account. *Id*. at 18–19. After funding was

approved at 4:49 PM, Beckett stated, twenty minutes later, that "we will prepare and submit." *Id.* at 18. Nevertheless, Smith averred that "[m]eanwhile, as it was nearing the end of the fiscal year which ends in September, our funds were being taken from our GPC purchase card for other priorities." ECF No. 52-1 at 2.

In his affidavit, McLaurin stated that Plaintiff told him "the VA would come survey her workplace and purchase the chair." ECF No. 22-5 at 2.[6] He told her that he "thought it would be best if we in 502CONS purchased the chair assuming that we would be able to purchase it faster that the VA would be able to purchase it." *Id.* He further averred that "[t]he unit cardholder [(Coleman)] that would have been the individual to actually execute the purchase informed [him] sometime in September that [Plaintiff] said the VA would take care of it and [Coleman] had cancelled the purchase request." ECF No. 22-5 at 2; ECF No. 32-3 at 287 (identifying cardholder as Coleman in Plaintiff's annotation). McLaurin "assume[d] that [Coleman] was not informed that he made the decision to purchase the chair and not involve the VA." ECF No. 22-5 at 2. He explained:

> Every year from September 1 to September 30 funds are withdrawn from each unit to ensure that funds that are not spent are diverted to purchase high priority items. Evidently, by the time I directed the card holder to make the purchase instead of letting the VA do it, our unit funding had already been withdrawn. I personally lost track of this issue assuming we would reengage on the purchase after the following year funds were sent to us later in October . . ..

*Id.*

Early in the afternoon on September 21, 2012, McLaurin sent Plaintiff an email regarding information Plaintiff had shared with him regarding her relationship with Smith. ECF No. 32-3 at 24 (Ex. 13). He told Plaintiff that he would meet with her "soon in a comfortable environment" but also assured her "that no one was on a hunt for you" the day before. *Id.* He explained that, as a Copper Cap intern, she "ultimately works for" him and he is "the only one that can establish

---

[6] Plaintiff provides the second page of this affidavit with her own annotations as Exhibit 81. *See* ECF No. 32-3 at 287.

issues on [her] performance record." *Id*. He understood that Plaintiff has "relayed there is too much office drama," while informing her that "Smith has stated that you work well and are very capable." *Id*.

Smith scheduled an in-person meeting with Plaintiff for September 24, 2012, to discuss a personnel issue. *See id*. at 25. On this date, Plaintiff made her "initial contact with the Equal Opportunity (EO) Office . . . seeking information on the EEO process." ECF No. 42-2 at 1. This same date, McLaurin became aware that Plaintiff had filed an EEO complaint against Smith and Beckett. ECF No. 22-5 at 1; ECF No. 32-3 at 128 (Ex. 50B).

At 6:17 AM on September 27, 2012, Plaintiff spoke with the VA and was informed that a "chair could not be ordered until a worksite evaluation was performed." ECF No. 32-3 at 28.

## C. October 2012

About noon on October 1, 2012, Plaintiff emailed Coleman to see if funding was available for the chair given the new fiscal year. *Id*. Coleman stated that he would purchase the chair when funds were received. *Id*. at 28, 37. When Plaintiff spoke to McLaurin two days later "about the status of the chair, he was surprised the chair had not yet arrived." *Id*. at 28. Coleman told Plaintiff that same day that "funds were still not available." *Id*.

By letter dated October 8, 2012, a physician stated that Plaintiff "is followed at our clinic and is cleared for participation without limitations in your physical fitness program that may include cardiovascular training, and flexibility training." ECF No. 22-3 at 4.

On October 15, 2012, Plaintiff asked the VA to "move forward with the worksite evaluation." ECF No. 32-3 at 38. That same day, she informed Tijerina that she "had not received her reasonable accommodation and was experiencing harassment stemming from that request." *Id*. at 29. When Plaintiff asked whether she could transfer "to a different squadron," Tijerina stated that was not an option for her. *Id*. That afternoon, Plaintiff "contacted Colonel Lamoureux, Commander

502 Mission Support Group, for help in purchasing the ergonomic chair." *Id*. at 29, 276; *accord* ECF No. 10 at 178–79 (full email to the Colonel); ECF No. 32-3 at 71–72 (Ex. 34, full email). Among other things, Plaintiff explained that she had provided a physician's letter in support of her accommodation request, but funding and other issues delayed receipt of an ergonomic chair. *See* ECF No. 32-3 at 71–72. The Colonel supported her request for an ergonomic chair without additional medical documentation. *Id*. at 290 (Ex. 83). Some time that day, Plaintiff "contacted the EO office to file an informal complaint of discrimination." *See* ECF No. 42-2 at 1; *accord* ECF No. 32-3 at 259 (Ex. 67C, Counselor's Report showing EEO visit), 279 (Ex. 76, Counselor's Report).

After Plaintiff complained to Colonel Lamoureux about the chair accommodation, the Colonel contacted McLaurin. ECF No. 22-5 at 2; ECF No. 32-3 at 287 (clarifying that Plaintiff contacted the Colonel on October 15, rather than "in early October"). McLaurin informed the Colonel that funding was lacking because September 30 "had passed and our [fiscal year 2013] budget had yet to be filled." ECF No. 22-5 at 2.

At 11:28 AM the next day, Beckett informed Underwood that, despite the prior approved funding, a new chair had not been procured for Plaintiff. ECF No. 32-3 at 20. She explained that Plaintiff had "asked we stop our action to procure," because "the VA would be buying the chair for her." *Id*. She stated that Plaintiff had stopped the procurement action "[j]ust after" Underwood had approved the funding, when Plaintiff's email to Smith and Coleman had been sent about four hours before Underwood approved the funding. *Compare id*. at 20 *with id*. at 17. Because "[u]nfortunately the VA ha[d] not come through with a chair," Beckett again sought funding approval through Underwood. *See id*. at 20.

At 11:53 AM on October 16, 2012, McLaurin emailed Plaintiff. *See id*. at 21. He therein thanked her for "decid[ing] to stay," surmised that she had resolved her "concern about having sufficient DAU training time," encouraged her to not be too concerned about using other's "time

as a marker," and commented that he was "sure you'll be fine." *Id*. He goes on to state that he thinks that she "incorrectly personalize[s] the comments and perceptions of others," assures her that "those in leadership positions . . . only want to see [her] successfully graduate from the program," and encourages her to "[c]ommunicate [her] requirements, work hard, train hard and [she will] do great!" *Id*. McLaurin also reminded Plaintiff that, "on your chair . . . we had approval in [fiscal year 2012] before you requested we cancel." *Id*. Although he states that they had funding approval before Plaintiff cancelled the request, Plaintiff had sent her cancellation email before funding was approved. *Compare id*. at 21 *with id*. at 17. He explains that, although "[w]e've yet to have our [fiscal year 2013] funds pushed down to the Squadron," they were "asking that they send us the [funds] for the chair since it was approved last year." *Id*.

In his affidavit, McLaurin explained that he sent the October 16 email "because the previous Friday, she left a yellow sticky note that stated she wanted to resign as she did not think the Copper Cap program was for her." ECF No. 22-5 at 5. Plaintiff had "alluded to a feedback session that [Beckett] had with all three copper cap interns and in which [Beckett] told [Plaintiff] that she [(Plaintiff)] needed better time management skills." *Id*. McLaurin perceived that Plaintiff's "initial reaction to this feedback was to resign." *Id*.

At 3:25 PM on October 16, 2012, Underwood responded to Beckett's morning email. *See id*. at 22. He informed Beckett that the prior approval was still in her office and should suffice to obtain the chair for Plaintiff. *See id*.

McLaurin told Plaintiff on October 17, 2012, that they were trying to fund the purchase. *Id*. at 30. That same day she was informed that timeliness would be affected even more if she needed to approve the chair selection. *Id*. at 31. McLaurin "explained the issues [the AF] encountered when Sep 30 passes." *Id*. at 42. He explained that, when the AF is "operating without a DOD budget and covered by a continuing resolution, it is common to sit without funding to until

December or later." *Id*. But the AF was working hard to get funding for the chair earlier. *Id*.

That same date, McLaurin, as Plaintiff's Second-Level Supervisor, approved Plaintiff's requested approval for "an excused absence not to exceed 3 normal duty hours a week for the sole purpose of participating in physical fitness activities." *See* ECF No. 22-3 at 2–3. Plaintiff signed the request and initialed each required understanding on October 18, 2012. *Id*. at 3. Attached to the approval is the doctor's statement of October 8, 2012. *See id*. at 4.

Plaintiff had continued email correspondence with Colonel Lamoureux on October 18, 2012. ECF No. 32-3 at 31, 275–76. In a follow-up email, the Colonel stated that he had been "told that the leadership within Contracting Squadron is now taking care of your needs." *Id*. at 276. He asked her to let him "know if this is not true." *Id*. She informed him that (1) leadership may have misled him, (2) she is hearing the same funding excuses, (3) she is "being blamed for not having the chair because they are making inaccurate and misleading claims" that "will come to light when [she does] her timeline for [her] EEO complaint," (4) they will not change her supervisor, and (5) Smith harasses her on a daily basis. *Id*. at 275. She expresses fear of reprisals and contends that Smith has been trying to force her to quit since she arrived in August. *Id*.

Smith emailed Beckett and McLaurin (with copies to Patricia Nichols[7] and Tijerina) raising her own complaints of harassment and stress caused by Plaintiff. *See id*. at 283–84 (Ex. 78). Smith related some harsh criticisms:

> Our office is full of stress with the work alone and it is unfortunate that an employee who is a trainee with less than 90 days has been able to constantly lie, manipulate, break the chain of command and disrespect leadership. The number of man hours expended on this individual continues to add up and it is already to the point of being considered fraud, waste and abuse.

*Id*. at 283. She goes on:

---

[7] The email clearly identifies the new recipient as "Patricia L Nichols." *See* ECF No. 32-3 at 283. A "Patsy L. Nichols" provided an affidavit during the administrative investigation, which Plaintiff provided with her original complaint. *See* ECF No. 10 at 139–42. The Court has no reason to view these as different women.

I have done nothing but attempt to assist this individual since she arrived to our office and in return she has blatantly lied on me in an e-mail to my Group Commander. I have repeatedly let this employee know that I am here to help her get trained to learn Contracting but she always finds a way to simultaneously go to various levels in the chain of command (but not in order) with stories that she has fabricated in an effort to have all of leadership's time and attention on her.

She told me herself she has it in her mind that I'm trying to set her up and I clarified for her that is the farthest thing from the truth. . . .

*Id*. at 283–84. She concluded by "seeking guidance" and stating that "[i]t is universally felt that [Plaintiff] is a problem employee who has yet to have a substantiated claim." *Id*. at 284.

When Plaintiff arrived at work on October 22, 2012, she found that her prior chair had been replaced with one that was damaged and wobbled. *Id*. at 31. This replacement chair resulted in her emailing management that the chair was not the one she had selected. *Id*. at 31, 39. McLaurin indicated that he had made the chair switch as a temporary accommodation. *Id*. at 31, 42. Plaintiff informed him that it was not a suitable replacement and "pulled her original chair back." *Id*. at 31. Late that afternoon, McLaurin requested that Plaintiff "refer to him on matters of the chair." *Id*. at 31, 42.

In an email dated October 22, 2012, Plaintiff "requested a temporary accommodation to do [her] DAU intern training from home until the chair was purchased." *Id*. at 31, 41. McLaurin denied the request. *Id*. at 31, 42. He explained that he did "not support working from home as reasonable accommodation," because of the nature of the intern program. *Id*. at 42. He viewed "the OJT program" to be "[t]he heart of the Copper Cap Intern training program" and viewed the essential elements of the intern position to consist of much more than "logging on to DAU and reading the FAR." *Id*.

In an email dated October 23, 2012, McLaurin had questions regarding Plaintiff's fitness request. *See* ECF No. 22-3 at 1. He invited Plaintiff to visit him to help him reconcile various matters. *Id*. Before moving ahead, he wanted to discuss the following issues: (1) reconciling the

fact that the same physician who approved of unrestricted exercise also recommended the ergo-
nomic chair; (2) reconciling the exercise approval with Plaintiff's complaints about her "legs going
numb and want to work from home because of your current level of pain," and (3) reconciling
Plaintiff's request to start the exercise program immediately with her other statements that she was
"behind in her training." *Id*. He explained that exercise "comes behind primary duties and train-
ing." *Id*. He stated that if she is "able to fit it into your schedule," he did not "expect to hear that
[she has] insufficient time to attend meetings, accomplish DAU training, or any other primary job
performance." *Id*. He informed her that by using the exercise privilege, she would be indicating
that she is "up to speed at work." *Id*. He further explained that her exercise schedule would be
coordinated with her Flight Chief and that the "program cannot be used to 'end the day early' or
'arrive late'" because members of the program "must depart from and return to the unit." *Id*.

Plaintiff provides a receipt dated October 24, 2012, for an ergonomic chair that she con-
tends was purchased for her by Colonel Lamoureux. ECF No. 32-3 at 23. The chair was delivered
the next day. *Id*. at 31. Plaintiff also provides an unsworn statement from Marc Williams, a Pro-
curement/Supply Specialist who worked with Plaintiff during the relevant time period. *See* ECF
No. 56-2 (Ex. 97). He states that he "ordered her specific healthcare ergonomic chair" and that
"502 CONS had more than enough funds to purchase the necessary medical chair." *Id*. His state-
ment, however, lacks any specificity as to when the funds were available. Clearly, they were avail-
able when he made the purchase, but he does not say when the funds became available. He also
does not specify whether he is speaking of funding through the Colonel or through avenues pursued
by Smith, Beckett, and McLaurin.

McLaurin averred that, because the Colonel "had unit money . . . he bought the chair with
his unit's Government Purchase Card (GPC) and resolved the situation immediately." ECF No.
22-5 at 2. McLaurin attributed the delay not to a lack of support for "the accommodation but simply

a bureaucratic budget issue that [the Colonel], given his position, was able to resolve faster than [McLaurin] could." *Id*.

On October 26, 2012, at 6:11 AM, Smith emailed Plaintiff (with copies to Beck and McLaurin) informing Plaintiff that she "must request leave and allow time for [her] approval/dis-approval . . . Merely submitting a leave slip is not sufficient." ECF No. 32-3 at 85 (Ex. 41). At 9:53 AM, Plaintiff responded that she had just returned from a doctor's appointment "and will be filing workers comp." *Id*. Plaintiff attached a CA-2 form indicating that she first became aware of the disease or illness (identifying condition as "Degenerative Disk Disease") on August 13, 2012, the same day she realized that the disease or illness was caused or aggravated by her employment.[8] *Id*. at 86. She connected the claim to her employment requiring prolonged sitting and her symptoms prompted her realization. *Id*. She indicated that she would provide medical records "after Physician review of appropriate documentation." *Id*.

That same day, Plaintiff submitted a Request for Leave or Approved Absence seeking to use accrued sick leave as well as leave without pay for absences from October 30, 2012, through November 26, 2012. *Id*. at 90. Smith denied the request the same day for lack of supporting medical documentation. *Id*. A handwritten note, presumably by Plaintiff, states that "Supervisor wants to see protected filed regarding medical. According to base policy, this leave is allowable if the su-pervisor is aware of the injury. She is." *Id*.

**D. November 2012**

On November 6, 2012, Smith provided a 90-day performance review for Plaintiff. *See* ECF No. 10 at 293. The review was highly critical with most areas needing significant improvement. *Id*. Plaintiff refused to sign the review and included several rebuttal comments. *Id*.

Before Smith presented it to Plaintiff, McLaurin saw the review and had no concerns about

---

[8] This CA-2 form appears to be the one discussed in an audio file (AF-7) addressed later.

it. ECF No. 22-5 at 3. He was present when Smith provided the feedback and he averred:

> The purpose of the feedback is to make the employee aware of any deficiencies and give them an opportunity to improve before the annual rating is rendered. The 90-day initial feedback are the equivalent to the civil service mid-term performance review. They are not included in the official personell [sic] record. Ms. Smith read the feedback session to Ms. Bravo who became upset. Ms. Bravo disagreed with the comments and Ms. Smith reiterated that she needed to improve.

*Id*. After Smith left the feedback session, McLaurin emphasized to Plaintiff "that the feedback session was just that, and that there was still a long ways to go before the final rating." *Id*. When Plaintiff told him that "she wanted to move from working with Ms. Smith and work for [him] directly or in another Flight ," he "told her, as [he] would tell anyone else, that Ms. Smith is stern but fair." *Id*. To McLaurin, Plaintiff "was not treated any differently than any other employee or Copper Cap Intern regarding her training and development." *Id*.

Beck agreed "with the comments listed by Ms. Smith." ECF No. 22-3 at 3. He relayed issues he had seen first-hand: (1) trouble with teamwork, (2) away from her desk, and (3) missing a mandatory meeting and then complaining about being taken away from her online training. *Id*. at 2–3. He did not view Plaintiff as being "treated any differently than any other Copper Cap Intern regarding her training and development. *Id*. at 3.

Plaintiff submits that she provided a letter from the VA dated November 14, 2012, that reflected that Plaintiff "was seen at our clinic for chronic low back pain" and it recommended the following restrictions for four weeks: (1) maximum lifting of ten pounds with no pushing or pulling of heavy objects; (2) avoid repetitive bending and stooping; and (3) recommended standing and stretching for five to ten minutes every two to three hours. ECF No. 32-3 at 44 (Ex. 24). She contends that she submitted this letter in response to Smith denying a request for Plaintiff "to periodically get up, stretch and walk to ensure her legs did not get numb." *See* ECF No. 56 at 8. Defendant denies that Plaintiff ever provided the letter, and provides sworn statements about what medical documentation had been received. *See* ECF No. 60 at 5. Smith avers that "[t]he only

16

medical documentation [she] received from [Plaintiff] was a doctor's statement which stated that she needed an ergonomic chair with lumbar support and adjustable height." ECF No. 52-1 at 3.

Plaintiff visited her physician on November 23, 2012, with complaints that her "back has been hurting." ECF No. 56-13 at 1. She reported that (1) "[s]he has been under continued stress at work," (2) her boss was unhappy about her request for an ergonomic chair because she "did not look disabled," (3) her base commander "did get her a better chair," and (4) her boss was unhappy that she filed an EEO complaint and went to the commander. *Id*. She also reported changing pain medications that "helps with pain, though it makes her feel more sedated/fatigued during the day, which does affect her work." *Id*. Physician notes indicate various impairments, including lumbosacral spondylosis, panic disorder, generalized anxiety disorder, low back pain, neck pain, and depression. *Id*. at 3. The physician's impression was chronic lower back pain and he changed her pain medication. *Id*.

### E. December 2012

McLaurin provided feedback to Plaintiff at a meeting on December 6, 2012. ECF No. 22-5 at 4. To his recollection, this is where he would have discussed subjects such as not wanting her "high" at work, he would not hire her for a permanent position, he did not agree with her filing disability charge of discrimination, and that she did not want him as a supervisor, but his comments were taken out of context. *See id*.

McLaurin did not recall the "high" comment, but he did discuss her coming to work under the affects of medication and stressed that she should not drive to work if it was not safe and should not be "under the influence of medication if it impacted her ability to work, and for which we had no medical documentation stating she required it." *Id*. He stressed that "she never once provided any medical documentation that stated she required medication, that she had any disability or that she was under any medical treatment." *Id*. The only medical documentation she provided "was the

statement requiring an ergonomic chair and a statement from the same doctor that said [she] was healthy enough to participate without restrictions in the USAF approved, on-the-clock exercise program." *Id*.

As for hiring her for a permanent position, he recalled asking her whether, if she were graduating at that time, does she think we would hire her, and her response indicated that she did not believe so. *Id*. To which, McLaurin said "she was probably right but there was time for her to recover." *Id*.

McLaurin knew that Plaintiff had filed an EEO complaint in October, but did not recall specifics because he was not a target of the complaint initially. *Id*. He stated that, "[o]ther than her verbal statements, [he] was not aware that she was disabled." *Id*. He viewed her statement that he did not support her EEO complaint as a "reference to the fact that [he does] not think 502CONS management discriminates against anyone for any reason." *Id*. He stated that he "certainly supported her ability to file a complaint if she feels that she encountered a work place situation that she wasn't able to resolve by elevating the issue within the chain of command." *Id*.

With respect to the statement that she would not want him as a supervisor, he recalled telling her that he "would probably have" given the same feedback as her other supervisors. *Id*. Although he "did not say she would not want me as her supervisor," he did say "that she would likely get the same feedback and direction from me as she received already." *Id*.

On December 10, 2012, Plaintiff filed her formal EEO complaint. *See* ECF No. 22-10 at 1.

## F. January and February 2013

An email from Plaintiff to her physician dated January 14, 2013, states that she is "in serious pain and really need to request FMLA leave from you." ECF No. 56-13 at 5. She tells the doctor that her "lower back is . . . severe and the medications are interfering with [her] work." *Id*.

As of February 2013, employee records indicate that Plaintiff's reportable disability was

Code 44, "Non-Paralytic orthopedic impairments." ECF No. 32-3 at 195. The standard form for Self-Identification of Disability encourages prospective employees to self-identify disability status "for effective data collection and analysis." *Id*. at 191. Provided information is "used for statistical purposes only and will not in any way affect [the employee] individually." *Id*. In full, Code 44 encompasses the following: "Non-paralytic orthopedic impairments: chronic pain, stiffness, weakness in bones or joints, some loss of ability to use part of parts of the body." *Id*.

Medical records dated February 4, 2013, state that Plaintiff's back condition impacts her ability to work in the following ways: "Unable to run, jump, jog. Difficulty with bending, stooping, twisting, sex and sleep, and prolonged sitting. Medications that they give her for the pain have side effects." ECF No. 56-13 at 10–11 (unnecessary uppercase omitted). Plaintiff was also "instructed to not drive when using medication due to drowsy side effects." *Id*. at 11.

Plaintiff emailed McLaurin and Beck about medical leave on February 6, 2013, at 11:32 AM. ECF No. 32-3 at 51–52. Addressing a request for leave without pay ("LWOP"), the email states in full:

> I will have to take time off to address my health, I will most likely leave early today and fill the leave form accordingly, as well as my time card. Mr. McLaurin according to EAP POC (Steve Henry), LWOP is permissible for individuals undergoing treatment that are disabled without FMLA. The last time I asked for this leave Ms. Smith denied it. I will fill out a leave slip in the interim and will return after my hours are exhausted if I do not receive and approved LWOP form signed by you or FMLA paperwork filled out by my VA Doctor with a filled out LWOP form.
>
> I apologize for the short notice; situations like this are not easily predictable.

*Id*. at 52. At 2:10 PM that day, Plaintiff emailed McLaurin and Beck a completed "Request for Leave or Approved Absence" in which she sought eight hours approved annual leave with a remark: "Will seek LWOP in order to begin a period of LWOP after 2/8/2013 for a period of 3 weeks or less due to undergoing medical treatment." ECF No. 22-6. That form included a Certification that Plaintiff understood that she "must comply with [her] employing agency's procedures for

requesting leave/approved absence (and provide additional documentation including medical certification, if required)." *Id*. Her request lacked any supporting medical documentation. *See id*.

These emails prompted an email exchange between McLaurin and Plaintiff that concluded after 5:00 PM. *See* ECF No. 32-3 at 50–51. McLaurin's first responsive email added Nichols to obtain guidance on the matter. *Id*. at 51. He also explained that, in his experience, LWOP applications are accompanied by a physician's statement of need and a date for return to duty. *Id*. He stated that he would "not approve LWOP without seeing this Physician's statement beforehand," although he also instructed Plaintiff to stop by if she would like to discuss the matter and asked Nichols to call him, if he was "off target." *Id*.

Plaintiff sent a responsive email that provided Mr. Henry's phone number, stated that he was "well versed" in FMLA and LWOP matters and indicated that there are "exceptions to the FMLA documentation with regards to LWOP as it relates to [her] situation." *Id*. at 50–51. Plaintiff's response garnered a second response from McLaurin where he explains:

> As a supervisor, I've approved LWOP and advanced leave in the past for employees. The employee came to me, turned in the physician's statement that showed when the absence was required (and usually why) and the proper paperwork. I review and take it to Personnel.
>
> That's the process to which I'm referring. You must provide a Dr's note before I can even start to consider allowing LWOP/Adv Sick Leave.

*Id*. at 50.

The next day, Nichols emailed Plaintiff asking her to call to discuss Plaintiff's options. *Id*. at 54. Nichols advised Plaintiff:

> Management must approve your request for LWOP, you cannot just take LWOP for a serious health condition without proper medical documentation to support the need for the leave. Per AFI 36-815 there are different rules based on individual situations and without having proper medical documentation management cannot make the decision you are asking them to make at this time.

*Id*.

On February 12, 2013, at 9:43 AM, Plaintiff emailed McLaurin (adding Beck at 9:50 AM): "Here is what I would like you to consider in order to grant my LWOP. I have made phone calls to the VA to get the a [sic] medical certification but it's hard to get an appointment (months). May I please go on LWOP to safely continue my medical treatment? I am asking for 3 weeks." ECF No. 22-7 (removing paragraph structure). She also included a regulation for their review. *See id*. (attaching AFI36-815). Later that day, at 4:36 PM, Plaintiff thanked McLaurin for approving advanced sick leave for February 15, 2013. *See* ECF No. 22-8. A few minutes later she emailed McLaurin regarding a second sick leave appointment for February 19, 2013. ECF No. 32-3 at 48. McLaurin approved the time off for the doctor's appointment "assuming this Dr appointment would generate the medical documents we needed to consider her request for extended medical absence leave." ECF No. 22-5 at 5. But he "never heard back or received anything after the date of the appointment and [Plaintiff] returned to work the following week and worked without any issue or occurrence up to the day she emailed her resignation" to him. *Id*.

On February 22, 2013, Plaintiff resigned via email. *See* ECF No. 32-3 at 308. She states in the email that she needs "to resign and take action to care for [her] health independent of management" but want "the investigation to move forward." *Id*. McLaurin sought guidance as to how to respond, emailed Plaintiff "to give her general guidance on what to do for the remainder of the day and . . . accepted her resignation." ECF No. 22-5 at 5; *accord* ECF No. 22-9.

The next day, the Social Security Administration ("SSA") approved disability for Plaintiff's back impairment. *See* ECF No. 32-3 at 229–30. On that date, she was permanently and totally disabled due to service-connected conditions. *Id*. at 229. Through letter dated August 15, 2013, the SSA informed Plaintiff that her "primary diagnosis is a disorder(s) of the back (discogenic and degenerative" and this "impairment is why SSA granted [her] monetary disability payments." *Id*. at 268. Through letter dated over ten years later, September 5, 2023, the SSA states that it found

Plaintiff "became disabled under [its] rules on February 25, 2013." *Id.* at 269.

### G. Undated Audio Recordings

Plaintiff has provided twelve undated audio recordings. *See* ECF No. 32-3 at 179 (Ex. 55, Table of Audio Files). She has also provided unsworn transcripts of the recordings. *See id.* 180–90. The Court will cite and refer to these recordings as AF-1, AF-2, etc. Although there are legitimate questions as to these audio files, the Court will address them briefly while essentially trusting the transcript provided (while also listening to the audio files) and the identification of the speakers.

In AF-1 (ECF No. 32-3 at 180), McLaurin mentions that he was the one who convinced others that it would be better for the Squadron to procure the chair than to let the VA do their workplace study. When Plaintiff mentioned specific pricing for a chair, McLaurin states that "it's not an issue of money that's very easy to do, we've been squandering money everywhere as you can see." He later says that "the chair is not an issue." And he adds, "we're getting it. How though, I got to tell you, it's nothing personal the way it was turned off, turned on, turned off, and unless you call by September 30, it's difficult." This latter statement suggests that the conversation occurred in October 2012.

In AF-2 (ECF No. 32-3 at 181), McLaurin informs Plaintiff that she is always allowed to file an EEO complaint, but he expresses a lack of understanding as to why Plaintiff has the perception that she feels she is being discriminated against based on some disability. The audio ends when he states: "You're always going to get a negative reaction anytime you name off Colonel Lamoureux or go visit EEOC and file charges." Plaintiff characterizes this as McLaurin speaking about retaliation. But a negative reaction does not necessarily equate to retaliation. The audio simply lacks enough context to provide any persuasive evidence of retaliation.

In AF-3 (ECF No. 32-3 at 181), McLaurin explains that various Squadrons already have

an internship program established where everything is already there. But that is not the circumstances of Plaintiff's internship. This audio does no more than to concede that the internship program that he manages is less established than other programs in other Squadrons. This is consistent with an email he sent to Plaintiff explaining: "OJT and working projects/tasks etc….are the heart of any training program and Copper Cap Interns are different from normal squadron allocations. This is an unusual squadron. The other two are much more stable and have been established for 50 years compared to our two years." ECF No. 32-3 at 170 (Ex. 51A). Being less established presents different issues than might arise in a normal squadron—such as the ready availability of an ergonomic chair in a more established program.

 In AF-4 (ECF No. 32-3 at 182), Smith states that there are probably some career fields that are more accommodating, and it would be ideal if Plaintiff's field permitted part-time positions, but that is simply not an option with Plaintiff's position. Smith goes on to concede that a career field such as contracting is pretty intense and recruiters probably do not consider that as well as they should. They just match any Schedule A person with any program, rather than fully considering the person and the program. Plaintiff agreed that recruiters put people in programs with high expectations but "that's hard because there's an array of disabilities you have to deal with." Smith voiced agreement with that sentiment. Although Plaintiff portrays this AF as Smith stating that Schedule A persons with disabilities should not be in the contracting career field, that is not what Smith was saying. Smith was merely recognizing that the contracting field may be a poor match for some individuals, especially individuals who may want or prefer a part-time position. This AF reflects a civil conversation between Smith and Plaintiff.

 AF-5 (ECF No. 32-3 at 183) is a not-so-clear, six second audio. Plaintiff's transcript says that McLaurin tells her "I don't want you here doing your work on narcotics," to which she says "Right," and McLaurin adds, "doped up." That appears to be a reasonable transcription of what is

said.

In AF-6 (ECF No. 32-3 at 183), McLaurin is discussing his viewpoint as to interns and training versus interns and working. Plaintiff states that both Smith and Beckett has said that she is behind on training, to which McLaurin states that he prefers interns to be doing work, because that "is the best school," and Plaintiff does not "have enough time in the saddle" to really know whether she is behind on training given the one-year period in which to complete Level 1 and Level 2 requirements. He says, "talk to me in 6 months and I can tell you if you're behind on training," but until then one just needs more time to ascertain that.

AF-7 (ECF No. 32-3 at 184–87) is four-minute audio where Smith is seeking guidance as to completing a CA-2 form. Her primary question was whether Plaintiff had to have medical documentation to support her requested leave. The representative said that the form can be submitted without such documentation, but she could not guarantee that it would be accepted. Smith stated: "I'm not signing the form without the mee…documentation. So, if you have any guidance, just submit it anyway or what?" The representative said: "Go ahead and submit it anyway, the injury compensation office will contact you if there is a problem with it."

AF-8 (ECF No. 32-3 at 187) is a seventeen-second audio where Smith is explaining that Beck has lost some help and that the Squadron was going to have Plaintiff "step in and pull some of that weight," which will "be expected of everybody, so they're going to be things that you may not have today that you're going to get."

AF-9 (ECF No. 32-3 at 188) is a recording of a meeting between Plaintiff, Beckett, and McLaurin where they discuss Smith's behavior. The recording starts with Plaintiff setting the context—she is sitting in Smith's office with Beck on a Monday morning for a counseling session titled behavioral issues, which was confusing to Plaintiff because McLaurin had sent her an email on Friday stating that Smith was saying Plaintiff was a good employee. Given this context, Plaintiff

is clearly referring to an email McLaurin sent to her on September 21, 2012. *See* ECF No. 32-3 at 24. Thus, the events she was describing occurred on September 24. She goes on to state how Smith started yelling at her and calling her a liar all in front of Beck. She then relates that during the EEO investigation, Beck said he would not call it yelling, her voice was elevated but not to the point of where he would consider it a yell.

AF-10 (ECF No. 32-3 at 189) is a brief recording where McLaurin explains that he got more directly involved with the intern program because the first intern of the program, who started a month or two before McLaurin arrived, essentially languished without guidance or structure, whereas Plaintiff has "had a structured environment." McLaurin got more involved to ensure "equitable application of the training environment across all flight" teams. Plaintiff characterizes this recording as regarding inequitable Copper Cap duties, but it is more properly characterized as a comparison of duties as they have changed over time and under his supervision.

AF-11 (ECF No. 32-3 at 189) is a fifteen-second recording of Smith explaining the importance of finishing prerequisites so that Plaintiff can move on to later courses.

AF-12 (ECF No. 32-3 at 190) is a brief follow-up recording following AF-11 where Smith is highlighting that some employees, like Beck, may choose to complete DAU courses at home so that they can complete a prerequisite course and move on to a later course. She clarified that she was "not saying you have to do this, but some people have done" so.

## H. Current Litigation

Plaintiff commenced this action by filing a pro se complaint with numerous attachments. *See* Compl. (ECF No. 10). Given the total pages of this filing (311), the Court will generally cite to it by the page number assigned through the electronic case filing system.

Based on prior rulings, the Rehabilitation Act ("RA") is the only appropriate authority through which Plaintiff may pursue her disability claims. *See* ECF No. 21. She alleges retaliation,

discrimination, and hostile work environment based on her disability. *See* ECF No. 10 at 11–14. Specifically, she raises two discrimination and hostile work environment claims: the AF (1) did not conduct a physical of her when Smith completed a supervisor's checklist for job induction; and (2) did not engage in a conversation to address her request for an ergonomic chair; did not provide an ergonomic chair; and denied requests to telework and for LWOP. *Id*. at 11–12. She also raises four retaliation claims: (1) Smith issued an inaccurate performance appraisal; (2) McLaurin made improper remarks during the December 2012 meeting; (3) the AF did not approve her request for LWOP, and (4) the AF did not select her for the position of an environment scientist. *Id*. at 13–14. Lastly, Bravo argues that the AF's denial of her request for LWOP resulted in a constructive discharge. *Id*. at 14.

Defendant moved for summary judgment on June 18, 2024. *See* ECF No. 52. Plaintiff filed her amended response on July 15, 2024, *see* ECF No. 56, which is timely based on a granted extension of time, *see* ECF No. 54. In granting the extension of time, the Court also granted Plaintiff's motion for leave to exceed the page limit (ECF No. 53), in which she asked "to exceed the page limit by approximately 10 pages." For a response to a motion for summary judgment, the normal page limit is twenty pages, "exclusive of the caption, the signature block, any certificate, and any accompanying documents." *See* W.D. Tex. Civ. R. 7(d)(3). Excluding those matters, Plaintiff's response is about thirty-three pages. *See* ECF No. 56. The Court accepts the response as within the amount permitted by the Court's leave—it exceeds the normal limit by thirteen pages, which the Court generously finds to be approximately ten pages as permitted by its ruling. Her arguments and contentions are limited to that document. Supporting attachments are not meant to provide another avenue to present arguments and contentions, but rather to provide support for the arguments and contentions made within the briefing.[9] While the Court might address an argument

---

[9] What the Court finds to be particularly troubling are the vast exhibits that Plaintiff attempts to rely on in which she

or contention raised only in an annotated exhibit, it is under no obligation to do so and may properly limit its consideration to arguments and contentions asserted within the permitted briefing.

Defendant timely filed its reply brief on July 29, 2024, *see* ECF No. 60, and a Notice to the Court Regarding Witness Statements (ECF No. 61) that same day. With that Notice, Defendant attached a Declaration of the investigator, Raymond Cantu, dated June 28, 2013, which establishes that the four witness statements were provided during the AF's investigation (ECF No. 10 at 139–42; ECF Nos. 22-2, 22-5, and 52-1).

On August 7, 2024, Plaintiff filed her motion to strike, *see* ECF No. 62, with her own Notice to the Court Regarding Witness Statement (ECF No. 63), wherein she states that she submitted a witness statement from Marc Williams to refute the written testimony of the four witnesses interviewed during the official investigation. Not only did Defendant respond to the motion to strike, *see* ECF No. 64, but he also filed a supplement with an exhibit, *see* ECF No. 65. The proffered exhibit is the first six pages of the Agency's Motion for Decision Without a Hearing that the AF filed with the AJ. Plaintiff filed a reply with an exhibit. *See* ECF Nos. 69–70.

Both motions are ready for ruling. The Court will first address the motion to strike before moving to the summary judgment motion.

## II. MOTION TO STRIKE

Through her motion to strike, Plaintiff seeks to strike Defendant's fact witness statements, the AF investigator's report, and the EEO counselor's report contained in the AF's Report of Investigation ("ROI") and Investigative File ("IF"), arguing that the witness statements are false, misleading, and hearsay. *See* ECF No. 62 (attaching the alleged offending documents as Exs. 109A

often annotates with comments, disagreements, and arguments over and above what she sets out in her brief. She attaches thirteen exhibits to her response (Exs. 96 through 108), which comprise 120 pages. But she also cites to exhibits previously submitted, the first ninety total 308 pages, with Exhibits 91 to 95 totaling another 21 pages.

through 109E with added comments to highlight testimony that Plaintiff contends is materially false and misleading). Through her supplement (ECF No. 66) to the motion to strike, Plaintiff includes four 180-page exhibits that contain the AF's ROI/IF (720 total pages), which Plaintiff identifies as Exhibit 109F, Parts 1 through 4. *See* ECF No. 66-1 through 66-4. With her reply brief, she also files part of the Agency's Motion for Decision without a Hearing, with her own annotations. *See* ECF No. 69.

Relying on Fed. R. Crim. P. 32(b) and Fed. R. Evid. 703, Plaintiff seeks to strike false written testimony reflected in Exhibits 109A (Smith Aff.), 109B (McLaurin Aff.), 109D (EEO Counselor's Report), and 109E (Report of Investigation). She contends the testimony is unreliable, misleading, and contradicted by evidence and documentation. She urges the Court to exclude such testimony to prevent prejudice and ensure a fair trial. Relying on Fed. R. Evid. 602 and 801, she seeks to strike Exhibit 109C (Nichols Aff.) as hearsay.

At one point, "the proper method by which to attack an affidavit was by filing a motion to strike," but amendments to the Federal Rules of Civil Procedure changed that practice. *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515 (5th Cir. 2012) (per curiam). Motions to strike are unnecessary for purposes of summary judgment. *Silo Rest. Inc. v. Allied Prop. & Cas. Ins. Co.*, 420 F. Supp. 3d 562, 569 (W.D. Tex. 2019). The proper procedure for contesting summary judgment evidence is to assert an objection to proffered evidence, not to move to strike the evidence. *See* Fed. R. Civ. P. 56(c)(2). "There is no need to make a separate motion to strike." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments. Accordingly, the Court denies the motion to strike as unnecessary. It will instead consider the filing as Plaintiff's Rule 56(c)(2) objections.

Plaintiff attached the Nichols affidavit to her complaint with Plaintiff's own additional commentary. *See* ECF No. 10 at 139–42. Defendant provided the McLaurin affidavit with his prior

motion for summary judgment. *See* ECF No. 22-5. He provided the affidavit of Smith with his current motion for summary judgment. *See* ECF No. 52-1. Defendant has relied on each affidavit in his current motion. *See*, *e.g.*, ECF No. 52 at 2-4.

Naturally, the proper time for asserting objections to proffered summary judgment evidence is in response to Defendant's reliance. But Plaintiff does not assert any specific objection to any of the affidavits in her response to the summary judgment motion. She does not assert objections to the affidavits until moving to strike nine days after Defendant's reply brief and notice to the Court regarding the witness statements. Defendant makes no new arguments in his reply brief. Nor does he further rely on the affidavits. The notice, furthermore, shows that the affidavits were part of the investigative file and attaches a declaration to establish that the statements within the affidavits were part of the investigative file. Plaintiff lodges no objection to the declaration provided with Defendant's reply brief, and all other objections are untimely.

The Court, however, need not rely on the untimeliness of the objections to overrule them. Defendant addresses the objections on the merits rather than asserting untimeliness. As Defendant argues, Plaintiff's reliance on Fed. R. Crim. P. 32(b) and Fed. R. Evid. 703 is misplaced. Neither rule applies to the affidavits submitted in this case. The former only applies in criminal proceedings, and the latter addresses expert opinion testimony, which is not at issue here. To the extent the evidence presented in Exhibits 109A, 109B, 109D, and 109E is unreliable, misleading, or contradicted by other evidence or documentation, Plaintiff's recourse is to make appropriate argument or provide evidence to the contrary, not to strike the evidence from consideration. As discussed more later, Plaintiff—as the party opposing summary judgment—enjoys some benefits such as the Court construing evidence in the light most favorable to her. But once Defendant satisfies his summary judgment burden, the burden switches to her to establish a genuine dispute of material fact, which requires more than mere reliance on her pleadings and arguments.

Exhibit 109C is an affidavit of Patsy Nichols, an employee of the Chief Workforce Effectiveness Branch. When Plaintiff attached this affidavit to her complaint with additional commentary, she made no comment as to any lack of personal knowledge or hearsay. While witnesses must have "personal knowledge of the matter" to which they provide testimony, *see* Fed. R. Evid. 602, Nichols, as part of the Chief Workforce Effectiveness Branch, has personal knowledge to conclude that Defendant properly denied Plaintiff's request to telework because interns should not work at home. *See* ECF No. 10 at 141. Similarly, she has personal knowledge to make statements regarding Plaintiff's LWOP requests. *See id.* at 161. Further, as to statements of others within the affidavit, the affidavit is not hearsay because Defendant does not offer any such statements "to prove the truth of any matter asserted therein." *See Acad. of Allergy & Asthma in Primary Care*, No. 5:14-CV-35-OLG, 2017 WL 11824765, at *7 (W.D. Tex. Sept. 29, 2017) (finding no hearsay in similar circumstances).

Within his response to the motion to strike, Defendant also asks the Court to take judicial notice of public records within the administrative file. ECF No. 64 at 2. For the reasons stated in Defendant's response, the Court will take judicial notice of such public records. Notably, the Fifth Circuit has long held that "EEOC determinations and findings of fact, although not binding on the trier of fact, are admissible as evidence in civil proceedings as probative of a claim of employment discrimination at issue in the civil proceedings." *McClure v. Mexia Indep. Sch. Dist.*, 750 F.2d 396, 400 (5th Cir. 1985). While this does not mean that "the entire EEOC file [is] admissible," *see id.*, Plaintiff has asserted no valid reason that the Court cannot consider the EEO documents submitted to it, and properly referenced by the parties in this case.

For the preceding reasons, the Court denies the motion to strike as unnecessary, overrules Plaintiff's Rule 56(c)(2) objections, and takes judicial notice of public records submitted to it.

### III. MOTION FOR SUMMARY JUDGMENT

Defendant seeks summary judgment on all claims asserted against him. Plaintiff opposes the motion.

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This includes identifying those portions of the record that the party contends demonstrate the absence of a genuine dispute of material fact. *Id.* When seeking summary judgment on an affirmative defense, the movant "must establish beyond peradventure" each essential element of the defense. *Access Mediquip LLC v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *adhered to on reh'g en banc*, 698 F.3d 229 (5th Cir. 2012); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

But when "the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is [a genuine dispute] of material fact warranting trial." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301–02 (5th Cir. 2020) (quoting *In re: La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017)). The movant need not "negate the elements of the nonmovant's case." *Austin v. Kroger Tex., LP*, 864 F.3d 326, 335 (5th Cir. 2017) (emphasis omitted) (parenthetically quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994) (en banc)). In these instances, however, the movant must "point[] out that there is no evidence to support a *specific element* of the nonmovant's claim"; rather than making "a conclusory assertion that the nonmovant has no evidence to support his *case*." *Id.* at 335 n.10.

Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Additionally, courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

## B. Exhaustion

Defendant argues that Plaintiff has failed to exhaust two claims: (1) the AF failed to conduct a required medical evaluation and (2) the AF did not select her for an environmental scientist position. ECF No. 52 at 9–12.

Through the Rehabilitation Act, Congress "established a private right of action subject to

the same procedural constraints (administrative exhaustion, etc.) set forth in Title VII of the Civil Rights Act." *Smith v. Potter*, 400 F. App'x 806, 811 (5th Cir. 2010) (per curiam) (quoting *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 304 (5th Cir. Unit A Nov. 1981)). In the employment context, a failure to exhaust is an affirmative defense. *Melgar v. T.B. Butler Publ'g Co., Inc.*, 931 F.3d 375, 379 n.3 (5th Cir. 2019). Before a federal employee may bring a Rehabilitation Act claim in federal court, "strict procedural requirements with respect to exhaustion of administrative remedies must be fulfilled." *Prewitt*, 662 F.2d at 303. Federal "employees must exhaust their administrative remedies by filing a charge of discrimination with the EEO division of their agency."[10] *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006).

As part of the administrative process, "[a]n aggrieved employee must 'initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.'" *Austin v. Potter*, 358 F. App'x 602, 605 (5th Cir. 2010) (per curiam) (quoting 29 C.F.R. § 1614.105(a)(1)). "Failure to notify the EEO counselor in timely fashion may bar a claim, absent a defense of waiver, estoppel, or equitable tolling." *Pacheco v. Rice*, 966 F.2d 904, 905 (5th Cir. 1992).

Even when complainants satisfy this forty-five-day period, they must pursue their claims through a formally filed charge. The scope of the investigation that "can reasonably be expected to grow out of the charge" defines the outer limits of the proper scope of the judicial complaint. *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 274 (5th Cir. 2008) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970)). In other words, a claim remains unexhausted and cannot be pursued through a judicial complaint when the claim is neither within the filed charge

---

[10] In contrast, "private sector employees must file an administrative charge with the Equal Employment Opportunity Commission (EEOC)." *Pacheco*, 448 F.3d at 788 n.6 (citing 42 U.S.C. § 2000e-(5)(b)). When the "relevant scope of the exhaustion requirement is the same for both federal and private employees," courts may "freely cite to both federal and private-sector employment-discrimination cases." *Id.*

nor one that would be reasonably expected to be investigated at the administrative level as an outgrowth of the claims raised. Courts "engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Pacheco*, 448 F.3d at 789. A lawsuit "may include allegations 'like or related to allegations contained in the charge and growing out of such allegations during'" the investigation. *McClain*, 519 F.3d at 273 (omitting bracketed material and quoting *Sanchez*, 431 F.2d at 466). While courts "liberally" construe administrative charges, "at least for the most part, the desired liberality is achieved by application of the rule that courts will look beyond the scope of the charge's language to the scope of the EEO investigation which can reasonably be expected to grow out of the charge." *Pacheco*, 448 F.3d at 789 n.9.

Defendant relies on both of these components to argue that Plaintiff has not exhausted the two identified claims. The Court need not address the forty-five-day component because it finds that Plaintiff did not assert either claim in her formal administrative claim and the claims are not within the scope of an investigation that can reasonably be expected to grow out of Plaintiff's formal charge.

Plaintiff made her initial contact with the Equal Opportunity Office on September 24, 2012. *See* ECF No. 42-2. She filed her informal complaint of discrimination on October 15, 2012. *See id.* She filed her formal complaint on December 12, 2012. *See id.*; *accord* ECF No. 22-10 at 1.

In her formal complaint, Plaintiff alleged discrimination on the basis of her physical disability and reprisal for previous EEO activity that had occurred on November 6 and December 6, 2012. ECF No. 32-3 at 256. She stated that she believed that Smith, Beckett, and McLaurin discriminated against her, with the most recent discrimination occurring on December 6, 2012. *Id.* In full, she provided the following explanation for why she believed she had been discriminated against:

34

> On or about August 13, 2012, I requested an ergonomic chair as a reasonable accommodation while speaking to Ms. Smith during my new employee in-brief. Ms. Smith stated that I did not look disabled and that my status does not make me special or entitled. I explained the extent of my lower back condition and the narcotics and other medications I am prescribed. Ms. Smith had a smug facial expression and stated the lack of squadron funding and the inability to make the purchase of an ergonomic chair. Additionally, there were no attempts by management to engage in a dialogue to address my request for accommodation. From August 12, 2012 until the present (November 10, 2012), Ms. Smith on an almost daily basis, has subjected me to harassment, intimidation, disparate treatment and a hostile work environment. On November 6, 2012, I received a 90 day performance appraisal that was less than favorable and contained false information not based on my actual performance. This reprisal was a result of my EEO complaint and Ms. Smith's continual attempts to sabotage my job in an attempt to have me terminated. Reprisal-On December 6, 2012, during a meeting with Mr. McLaurin I requested an accommodation based on my used of prescription pain medication for my disability. Mr. McLaurin stated that he did not want me "high" at work and noted that if he had a permanent position available he would not hire me. He also shared his opinion that he did not agree with my filing of the EEO charge based on my disability. Mr. McLaurin noted that I would not want him as my supervisor.

*Id*. In addition to various requested monetary relief, she stated that she sought "reassignment outside the Contracting career field" and an "internal investigation" into management staff. *Id*. at 257.

In a memorandum dated January 28, 2013, the EO memorialized those events, enclosed the EEO Counselor's Report for Plaintiff's review, and identified the following claims that would be investigated based on her complaint: (1) whether Plaintiff was subjected to discrimination based on a physical disability when management failed to make a reasonable accommodation, namely an alleged failure to timely provide an ergonomic chair on or about August 13, 2012; (2) whether Plaintiff was subjected to a hostile work environment and disparate treatment based on a physical disability when management (a) failed to engage in dialogue about the chair between August 13, 2012, and November 10, 2012; and (b) denied a request to telework between August 31, 2012, and October 28, 2012; and (3) whether Plaintiff was subject to reprisal for filing an EEO complaint when on (a) November 6, 2012, Plaintiff received a less than favorable performance appraisal by Smith; and (b) on December 6, 2012, McLaurin made comments to Plaintiff at a meeting. *See id*. Through the memorandum, the EO informed Plaintiff that, if she intended to bring other claims,

she could "provide these claims as background evidence during the investigation," and if she disagreed with the description of her claims, she "may submit a statement to the EO office which will become part of the complaint file." ECF No. 42-2.

The Counselor's Report identifies three broad bases raised by Plaintiff in her informal and formal complaints: "Disability (physical), Harassment, and Reprisal." ECF No. 32-3 at 259 (Ex. 67C).[11] It also identifies the following raised issues: (1) was Plaintiff subjected to harassment based on her disability from August 31, 2012, through October 15, 2012, when (a) on September 21, 2012, she reported Smith and McLaurin for intimidation and sabotaging her job and (b) on August 13, 2012, when Plaintiff requested a chair from Smith who communicated the request to Beckett, but no chair was provided; and (2) was Plaintiff subject to reprisal when she received a less than favorable performance appraisal from Smith on November 6, 2012, after Plaintiff had filed an EEO complaint. *See id.* at 259-60. This report does not mention a failure to conduct a physical or anything about being passed over for a position as an environmental scientist. *See id*. at 259–65.

In a memorandum dated March 7, 2013, the EO memorialized Plaintiff's amendment to her complaint on February 22, 2013, with a reprisal allegation based on a failure to accommodate her request for three weeks leave without pay on February 12, 2013, resulting in her resignation (constructive discharge) effective February 22, 2013. *See* ECF No. 42-2 at 3. Through the memorandum, the EO instructed Plaintiff to notify the EO in writing "and specify in writing why [she] believe[s] the claims(s) have not been correctly identified." *Id*.

Plaintiff has not pointed to any document in the record where she informed the EO of any disagreement with the characterization of the claims set forth in either memorandum from the EO. Furthermore, as stated in a Report of Investigation dated July 31, 2013, the EEOC investigated the

---

[11] The first two pages of this report are included in ECF No. 52-2. The Court views the complete report as the better source to cite.

claims identified by the EO. *See* ECF No. 22-10 (full ten-page report).[12] Moreover, the claims identified by the EO are accurately summarized from the formal complaint. *Compare* ECF No. 42-2 *with* ECF No. 32-3 at 256–57.

The AF concluded its EO investigation on June 28, 2013, and issued its Report on July 31, 2013. *See* ECF No. 22-10 at 1. It recognized an amendment accepted on March 7, 2013, and the same claims listed in the memoranda of January 28 and March 7, 2013. *See id.* at 1–2. The report does not mention Plaintiff's non-selection, nor her claim regarding a medical evaluation. *See*, *generally*, *id.*

Seven days before issuance of the report, email correspondence dated July 24, 2013, indicates that the EO investigator (Cantu) suggested that Plaintiff go through EEO for a claim regarding her non-selection for a different position. ECF No. 10 at 166; ECF No. 32-3 at 59. Later that day an EO Specialist informed Plaintiff that, if she believed that she has been discriminated against based on a non-selection, then she needed to file a new EEO complaint to raise that new claim. ECF No. 10 at 165; ECF No. 32-3 at 58. Plaintiff signed and has provided a completed and dated (July 24, 2013) EEO contact/initial interview regarding the non-selection.  *See* ECF No. 56-3 at 11.

On August 6, 2013, the EO Specialist informed Plaintiff that she had misinformed Plaintiff when she said her non-selection claim "would be a new complaint," she instead stated that "your complaint will be amended." ECF No. 32-3 at 56.

Despite that indication from the EO Specialist, Plaintiff did not obtain a formal amendment to add her non-selection claim to her formal EEO complaint. And on September 10, 2013, Plaintiff requested a hearing before an Administrative Judge ("AJ") regarding her formal complaint. *See*

---

[12] The first two pages of this report are also found at ECF No. 42-3. The Court views the complete report as the better source to cite.

ECF No. 42-4. She therein certified "that either more than 180 days have passed from the date [she] filed [her] complaint or [she has] received a notice from the agency that [she] has thirty (30) days to elect a hearing or a final agency decision." *Id.*

At this point, having received no formal acceptance of an amendment adding the non-selection claim to her formal complaint, and with the investigation of that complaint already complete, Plaintiff essentially ended any potential expectation that the investigation would encompass the non-selection claim by requesting a hearing before an AJ. The Court sees no basis for finding that the non-selection claim was reasonably expected to grow out of Plaintiff's administrative charge. The filed charge related solely to Plaintiff's internship with the AF. The non-selection issue arose after she resigned her internship. Nothing in the charge would lead to investigating Plaintiff not being selected for a position unrelated to the resigned internship. Plaintiff ultimately mentioned the non-selection to the investigator who advised her to pursue it through the EEO. When Plaintiff sought guidance from the EO after the investigation was complete, but seven days before the formal investigatory report was issued, she was first told to pursue it as a new claim. About a week after issuance of the formal report, the EO corrected the guidance to indicate that the claim would be considered as an amendment rather than a new claim. But the claim was not formally added as an amendment so that the investigation could be reopened to consider it. And before any such action occurred, Plaintiff requested that her formal complaint be heard before an AJ.

The Court likewise finds no basis for finding that Plaintiff's claim regarding a medical evaluation would have been reasonably expected to grow out of the administrative charge. Nothing in the filed charge would create such expectation and the resulting investigation never touched upon it. When nothing in the underlying "charge remotely relates" to claims raised in federal court and the resulting administrative investigation did not encompass such claims, courts may properly

find the claims to be unexhausted. *See Stingley v. Watson Quality Ford, Jackson, MS*, 836 F. App'x 286, 292 (5th Cir. 2020) (per curiam).

Plaintiff argues that the AF should have conducted a medical evaluation based on the employee intake form completed on August 14, 2012. The first section of that form is a checklist for supervisors to be ready to receive new employees. *See* ECF No. 32-3 at 9. Paragraph 6 of the checklist relates to verifying an employee's abilities and addresses a contingent medical evaluation. *See id.* Plaintiff's supervisor, Smith, checked the box as complete, *see id.*, even though the AF had conducted no medical evaluation. Both Plaintiff and Smith signed the form on August 14, 2012. *Id.* at 10.

After commencement of her employment with the AF, Plaintiff provided a letter, dated August 21, 2012, from the Department of Veterans Affairs that she "is followed at our office for chronic medical condition and needs an ergonomic chair lumbar adjustment for height and depth." *See id.* at 12. But she neither requested nor challenged the absence of a medical evaluation.

Further, the subsequent proceedings before the AJ did not cover the non-selection or medical-evaluation claims. *See* ECF No. 10 at 26-40 (EEOC Decision and Order Granting Agency's Motion for Summary Judgment dated July 23, 2020); ECF No. 10 at 22-23 (decision on request for reconsideration). When the AF moved for summary judgment on the claims before the EEOC, Plaintiff neither responded to the motion nor otherwise raised the non-selection or medical-evaluation issues to the AJ. *See* ECF No. 10 at 26.

As an affirmative defense, Defendant has the burden to show that the defense entitles him to summary judgment. For the preceding reasons, the Court finds that Defendant has carried that burden. Plaintiff has not exhausted her claims that the AF failed to conduct a physical or select her as an environmental scientist. Accordingly, summary judgment for the Defendant is granted on these claims.

**C. Exhausted RA Claims**

Plaintiff presents several exhausted RA claims in this action. The first is based on disability discrimination, harassment, and hostile work environment concerning the AF's failure to engage in a conversation to address her request for an ergonomic chair; failure to provide an ergonomic chair; and the denial of requests to telework and for LWOP. The others are based on retaliation for Smith issuing her performance appraisal; McLaurin making improper remarks during the December 2012 meeting; and the denial of her LWOP request. She also argues that the denial of the LWOP request resulted in a constructive discharge.

Defendant argues that Plaintiff is not disabled within the meaning of the RA. He further argues that Plaintiff has failed to establish a prima facie case for any discrimination, retaliation, hostile work environment, or constructive discharge. He lastly argues that, even if she has established a prima facie case, she has failed to show that his proffered reasons are pretextual.

As codified in 29 U.S.C. § 794(a), Section 504 of the Rehabilitation Act provides in pertinent part that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." This statute applies in the federal employment context and "prohibit[s] employment discrimination against qualified individuals with disabilities." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (per curiam). RA claims "are judged under the same legal standards," with "the same remedies," as claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a). *Id.*

Thus, as with an ADA claim, a discrimination claim under the RA includes a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered

40

entity." *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)). "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) [s]he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015); *accord Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013).

Disability discrimination also includes hostile work environment and harassment claims. *Frazier-Barnes v. McDonough*, No. 22-60383, 2023 WL 3197059, at *5 (5th Cir. May 2, 2023) (per curiam).

> "[T]o succeed on a claim of disability-based harassment, the plaintiff must prove: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action."

*Id.* (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 506 (5th Cir. 2002)).

Because Plaintiff's claims of disability discrimination are based on circumstantial evidence, the *McDonnell Douglas*[13] burden-shifting framework applies. *Julian v. DeJoy*, No. 23-11101, 2024 WL 4433076, at *4 (5th Cir. Oct. 7, 2024) (per curiam); *accord Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 585 (5th Cir. 2021) ("Rehabilitation Act claims are also analyzed under the *McDonnell Douglas* burden-shifting framework.").

> To establish a prima facie case of discrimination under the Rehabilitation Act, "a plaintiff must prove that (1) she is an 'individual with a disability'; (2) who is 'otherwise qualified'; (3) who worked for a 'program or activity receiving Federal financial assistance'; and (4) that she was discriminated against 'solely by reason of her or his disability.'"

*Houston*, 17 F.4th at 585 (quoting *Hileman v. City of Dall.*, 115 F.3d 352, 353 (5th Cir. 1997)).

---

[13] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Discrimination as a motivating factor does not satisfy the fourth element. *Id.*

Furthermore, like the ADA, the RA also prohibits retaliation. *January v. City of Huntsville*, 74 F.4th 646, 652 (5th Cir. 2023). Similarly, because Plaintiff relies only on "circumstantial evidence of retaliation," she also "must satisfy the burden-shifting *McDonnell Douglas* test." *Id.* at 653. This entails first making "out a prima facie case by showing (1) engagement in protected activity, (2) an adverse employment action, and (3) a causal connection between the two." *Id.*

Once the plaintiff makes out a prima facie case, the burden shifts to the employer to "come forward with a legitimate, non-discriminatory [and nonretaliatory] reason for the adverse action." *Id.* And once the employer comes forward with such reason, the plaintiff "must then show 'sufficient evidence that the proffered reason is a pretext for retaliation'" or discrimination. *Id.* (quoting *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 348–49 (5th Cir. 2019)). To carry this latter burden, a plaintiff must produce "substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Id.* at 654 (quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015)). Proffered "evidence is substantial if it 'is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'" *Id.* (quoting *Burton*, 798 F.3d at 233). Plaintiffs "must rebut 'each discrete reason proffered by'" the employer. *Id.* (same).

### 1. Individual with a Disability

The parties disagree whether Plaintiff qualifies as an individual with a disability. For purposes of summary judgment, the Court will assume without deciding that Plaintiff qualifies as such an individual under the RA. It will note, however, that VA ratings "are assessed pursuant to a standard entirely different from that imposed by the [RA] (which incorporates the ADA standards), and are therefore insufficient to create a genuine issue of fact that Plaintiff is disabled under the [RA]." *Burns v. Nielsen*, 456 F. Supp. 3d 807, 825 (W.D. Tex. 2020) (quoting *Mosley v. Potter*,

No. H-08-484, 2009 WL 3672830, at *4 & n.27 (S.D. Tex. Nov. 2, 2009)). VA "ratings attempt to quantify a decrease in a veteran's earning capacity" and thus "represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations." *Mosley*, 2009 WL 3672830, at *4 (citations omitted). Consequently, Plaintiff's VA disability ratings are immaterial to the RA analysis.

The Court notes these legal principles because Plaintiff often indicates that, as a Schedule A hire as a disabled veteran, others knew or should have known she was disabled. But disability under the VA standards may not make one disabled for other purposes. Given its other rulings, the Court need not determine whether she was disabled under the RA.

### 2. Reasonable Accommodation

Employers must "reasonably accommodate limitations, not disabilities." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996). It is thus "important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability." *Id*. Employers are not required "to assume that an employee with a disability suffers from a limitation; indeed, "better public policy dictates the opposite presumption: that disabled employees are not limited in their abilities to adequately perform their jobs." *Id*. When "the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer . . . the initial burden rests primarily upon the employee, or his health-care provider, to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Id*. at 165.

Plaintiff asserts that the AF failed to accommodate her by not engaging in a dialogue about an ergonomic chair, not providing her an ergonomic chair, and denying her requests to telework and for LWOP. But she provided scant information to the AF concerning her limitations.

Nearly immediately upon starting her internship, Plaintiff requested an ergonomic chair as a reasonable accommodation. Regardless of the precise day of the request, her identification of a chosen accommodation commenced "the employer's obligation to participate in the interactive process of determining one." *Taylor*, 93 F.3d at 165. Defendant participated in such process by relaying funding issues and asking for medical documentation. Everyone agrees that Plaintiff provided medical documentation through the August 21, 2012 letter from the VA that she needs an ergonomic chair. While this letter is somewhat vague as to the limitations of Plaintiff, it is specific as to the accommodation recommended by the VA. Plaintiff also states that she provided other medical disclosures with the VA letter, *see* ECF No. 56 at 4, but she points to no summary judgment evidence to support that as fact. And even if she did provide those medical records (Exs. 61, 63, 64, and 72), they do not reveal any limitations. Part of Exhibit 61, moreover, relates to time periods after Plaintiff contends that she provided the records to the AF. *See* ECF No. 32-3 at 227–30 (medical records dated in 2013, 2014, and 2018).

As of August 22, 2012, Defendant had at least some medical documentation to support procuring an ergonomic chair as a reasonable accommodation. Although Plaintiff states that she hand delivered the letter to Smith on that date, Plaintiff provides no evidence of any discussion of the matter at that time. According to Plaintiff, Smith simply placed it her inbox where it remained until September 5, 2012. Plaintiff points to nothing to show that Smith refused to engage in the "flexible, interactive process" envisioned after a request for reasonable accommodation is made. *See Taylor*, 93 F.3d at 165. Plaintiff points to nothing to show that she herself made any attempt to engage in that process during that period. She just contends that on September 5, 2012, Smith directed her to select an ergonomic chair. ECF No. 32-3 at 27. After Plaintiff selected a chair, Smith gave "the green light to purchase the chair" that same day, but Coleman responded that funds were unavailable. *See id.*

The record clearly reflects that the issue of funding remained as of September 5, 2012. It is widely known that federal fiscal year runs from October 1 through September 30 of any given year. And McLaurin has recognized the federal fiscal year in his various uncontested statements. It is neither unexpected nor abnormal that funding may be short at the end of a fiscal year. And McLaurin explains that it takes time at the beginning of a new fiscal year for funds to funnel down to the departments.

While Plaintiff speculates and believes that funding was available, she presents no evidence of that. That McLaurin made a remark about squandering funding does not mean that funding was available for a chair at that time. Likewise, that Plaintiff saw twenty new conference chairs delivered between August 22 and September 5, 2012, does not mean that funding was available when she provided the medical documentation on August 22. As previously discussed, Plaintiff has provided an unsworn statement from Marc Williams who worked with her at the relevant time. *See* ECF No. 56-2 (Ex. 97). But he provides insufficient information to create a genuine dispute of material fact as to whether funding issues precluded the purchase of the chair at relevant times.

The record also clearly reflects that, during the early afternoon of September 6, 2012, Plaintiff emailed Smith and Coleman telling them to disregard the chair because the VA was going to take care of it. *See* ECF No. 32-3 at 17. At that point, Plaintiff ended Defendant's obligation regarding the chair. Although Plaintiff argues that a later email nullified her email, *see id.* (referencing Ex. 8 in Plaintiff's annotation), that later email from Beckett merely continued to seek funding for the chair, *see id.* at 18–19. That email of itself shows no nullification of Plaintiff's email to disregard the chair.

Within her Exhibit 10, Plaintiff contends that the chair was never cancelled and that her filings demonstrate that the email to disregard the reasonable accommodation was termed. ECF No. 32-3 at 21. The fact that one email (Ex. 8) sought funding a couple hours after Plaintiff's email

(Ex. 7) to disregard the chair does not demonstrate the termination of the email to disregard. The record as a whole does not permit the Court to reasonably make that inference even when viewing the light in the most favorable to Plaintiff. There is no evidence that her request to cancel the chair was termed by a later email seeking funding approval, or even the funding approval itself. The process for obtaining a reasonable accommodation is an interactive two-way dialogue between employer and employee. When the employee drops her request for accommodation by emailing her first-level supervisor and the employee to make the purchase, the collaborative process is impeded when the employee does not affirmatively rescind her direction to disregard the chair. Plaintiff points to nothing to show that she informed either Smith or Coleman that she wanted to proceed with the chair purchase until October 1, 2012, when she reached out to Coleman at the start of the new fiscal year. Indeed, before recontacting Coleman on October 1, Plaintiff learned that the VA on September 27, 2012, could not order a chair until a worksite evaluation was done. *See* ECF No. 32-3 at 28. If the chair accommodation was supposed to come from within her Squadron, one wonders why Plaintiff was checking with the VA.

Viewing the facts in the light most favorable to Plaintiff, it does appear that she spoke to McLaurin about procuring the chair after she had sent the email to disregard the chair request. That may have been the ultimate cause for the funding approval just hours after the disregard email. But despite that funding approval, miscommunication or misunderstanding between Squadron personnel resulted in the purchase either being cancelled or put on hold.

In any event, the summary judgment evidence shows that Defendant was engaging in the good faith interactive process to reasonably accommodate Plaintiff by procuring an ergonomic chair. Plaintiff had provided medical documentation to support her requested accommodation. Even though the documentation was vague as to Plaintiff's limitations, Defendant pursued funding for a chair. Just prior to resolution of funding, Plaintiff emailed her first-line supervisor and an

employee responsible for making the purchase (Coleman) directing them to disregard her request for a chair. Even though Plaintiff sent that email, other personnel continued to work to secure funding. Funding was secured the same day that Plaintiff dropped her accommodation request. Nevertheless, at the very least, some "responsibility for the breakdown of the informal, interactive process is traceable to the employee and not the employer," under these facts. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011). This precludes finding that Defendant failed to reasonably accommodate Plaintiff. *See id.*

Notably, when Beckett contacted Underwood for funding in October 2012, she pointed out that when he had approved funding on September 6, 2012, he had done so by "cut[ting] out some funds." *See* ECF No. 32-3 at 20. This seems to indicate that Underwood secured funding in September not because it was readily available but because he was able to rearrange funding to purchase the chair. Plaintiff misinterprets the statement of cutting funds as Underwood cutting funds earmarked for her chair, *see id.* at 29, when the email seems to be recognizing his efforts at redirecting other funding to fund the chair.

To the extent that Plaintiff complains that the AF unreasonably delayed in providing an ergonomic chair, the Court finds no unreasonable delay under the facts of this case. First, nothing requires employers to "move with maximum speed to complete this process and preempt any possible concerns." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 737 (5th Cir. 1999). To the contrary, "in an informal process the employer is entitled to move at whatever pace he chooses as long as the ultimate problem—the employee's performance of her duties—is not truly imminent." *Id.* There is no separate claim for undue delay, such delay constitutes a violation only "to the extent it renders an accommodation (if any) unreasonable." *Schilling v. La. Dep't of Trans. & Dev.*, 662 F. App'x 243, 247 (5th Cir. 2016) (per curiam). And "the manner in which an employer engages in the interactive process and the speed at which that process occurs inform whether the employer

has acted in good faith." *Id.*

Plaintiff ignores her own role in the delay. The AF properly sought medical documentation for the accommodation proposed by Plaintiff. That delayed the matter until she provided the physician's letter on August 22, 2012. But the physician's note merely states that Plaintiff was "followed" for a "chronic medical condition" that presented a need for "an ergonomic chair with lumbar adjustment." *See* ECF No. 32-3 at 12. The note does not suggest an imminent need for an ergonomic chair. And at that point, Plaintiff should have known that funding would still be an issue at a government job that requires approval for purchases. Still, within two weeks of the medical submission, the Squadron secured funding. At this point, the record shows that the employer had engaged in the interactive process in good faith and had obtained funding for the requested accommodation.

But Plaintiff interrupted the process with her email to disregard the chair. While there may have been some uncertainty, miscommunication, or misunderstanding stemming from her recission, nothing of record indicates that the AF used her "disregard email" to disengage from good faith participation in the interactive process. The interruption, however, did result in further delay. When Plaintiff inquired about funding after the new year, she was told funding was not available. And notably, on October 8, 2012, the same physician who indicated a need for the ergonomic chair cleared Plaintiff "for participation without limitations" in the AF's physical fitness program. ECF No. 22-3 at 4. That medical note lessens any perceived imminency in the need for an ergonomic chair. Reasonable accommodations are to address an employee's limitations and that note indicates no limitations as to exercising.

The interactive process occurring in October 2012 reveals funding issues due to the commencement of a new fiscal year. On October 16, 2012, McLaurin specifically informed her that funds for fiscal year 2013 had not yet been received but the Squadron was asking for the funding

that was approved in fiscal year 2012. ECF No. 32-3 at 21. McLaurin attempted a different chair that Plaintiff did not like before the Colonel was able to secure funding for an ergonomic chair for Plaintiff on October 24, 2012. Upon delivery of that chair on the 25th, Plaintiff had the accommodation that she had requested. That it came from the Colonel's budget rather than the Squadron's is of no importance.

Essentially it took two months to obtain an ergonomic chair for Plaintiff after she submitted the physician's note saying she needed one. But it only took two weeks before Defendant had both the requested medical documentation and approved funding. The additional delay was caused by a combination of factors, including Plaintiff telling two persons within her employer group (Smith and Coleman) to disregard the chair request while she also interacted with a different entity (the VA) and different persons within her employer group, namely her second and fourth-level supervisors (McLaurin and the Colonel). For the reasons stated, the Court finds no basis to find any unreasonable delay or any failure to provide an ergonomic chair as a reasonable accommodation. Defendant is thus entitled to summary judgment on these failure-to-accommodate claims.

Furthermore, the requirement for "the parties to engage in an interactive process is not an end in itself—it is a means to the end of forging reasonable accommodations." *Loulseged*, 178 F.3d at 736. Therefore, a claim that the employer has "failed to engage in the interactive process . . . is not actionable for the same reason [Plaintiff's] reasonable accommodation claim fails." *Austgen v. Allied Barton Sec. Servs., LLC*, 815 F. App'x 772, 776 (5th Cir. 2020) (per curiam).

Plaintiff also presents a failure-to-accommodate claim based on denying her request to telework. In an email dated October 22, 2012, Plaintiff requested to telework for her DAU training until a chair was purchased. *See* ECF No. 32-3 at 31, 41. As an initial matter, telework is not generally regarded as a reasonable accommodation. *See Credeur v. La. through Off. of Att'y Gen.*, 860 F.3d 785, 793–96 (5th Cir. 2017). Further, provided medical documentation about Plaintiff's

limitations provide no basis to permit teleworking as a reasonable accommodation in this case.

Moreover, Defendant cites to summary judgment evidence that the AF considers working remotely as contrary to the essential functions of Plaintiff's position. *See* ECF No. 32-3 at 42. McLaurin views "the OJT program" as the "heart" of the intern training program. *Id.* This is consistent with the program as set out in the Copper Cap Training Plan. *See* ECF No. 22-1. While DAU "is a critical component for intern development," this does not conflict with McLaurin's reason for denying Plaintiff permission to telework in October 2012, as Plaintiff argues, *see* ECF No. 36 at 13 (Ex. 91); ECF No. 56 at 10. DAU is but one component of the three-pronged approach of the program. *See* ECF No. 22-1 ¶ 1. While the program contemplated on-line training occurring away from the work site, interns were to accomplish such training "at the work site as much as possible," there needed to be "coverage during absences for in residence training," and on-line training off the work site was only with preapproval from the Flight Chief. *Id.* ¶ 2. Reading the purpose and parameters of the intern program as a whole, it is readily apparent that teleworking was contrary to most aspects of the program.

Further, Nichols stated in her affidavit: "It would be inappropriate for an intern who was supposed to be learning, to work from home. She was a trainee and needed to be working in the office to learn how contacting [(presumably this was meant to say contracting)] was done in that agency." ECF No. 10 at 141.

In his affidavit, Beck stated: "The first year of a Copper Cap program involves formal training, a lot of online training, and OJT, which is the reason [Plaintiff] was assigned to my team. Attendance during this first year is crucial." ECF No. 22-2 at 1. He further averred that, although he was not involved in the denial of Plaintiff's teleworking request, he knew of "no other copper cap intern" that worked from home. *Id.* at 2. He added that "[s]pecifically for our flight, Construction, people need to be able to go out to the construction site and inspect. Working from home is

not conducive to that. Also the computers and software we have could not be used at home without major cost." *Id.*

The above evidence indicates that the policies and practices regarding Plaintiff's position point to regular work-site attendance as being an essential function of the job. Plaintiff fails to create a genuine dispute of material fact on this issue. Her subject beliefs are insufficient. While courts "are mindful that employees can be good sources of information regarding their day-to-day activities and the prerequisites for success on the job, "[a]n employee's unsupported testimony that she could perform her job functions from home" does not create a genuine dispute of fact to preclude summary judgment." *Credeur*, 860 F.3d at 793 (quoting *EEOC v. Ford Motor Co.*, 782 F.3d 753, 763–64 (6th Cir. 2015) (en banc)). Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claim premised on the refusal to permit her to telework. *Id.* at 795.

With respect to LWOP, Plaintiff fails to show that an extended leave of absence was necessary or reasonable when she sought to take three weeks in in February 2013 or the time off in October/November. It is her "burden to demonstrate her requested accommodation was reasonable." *Scott v. J.P. Morgan Chase Bank*, No. SA-08-CA-345-PM, 2009 WL 10705323, at *8 (W.D. Tex. Mar. 4, 2009) (citing *Riel v. Electronic Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996)). When an employee fails to cite to any "medical evidence to show her medical provider prescribed any type of leave of absence associated with her disability," the employee "has not shown that a leave of absence was necessary, much less reasonable." *Id.*

In this case, Plaintiff provided no medical documentation for any request for LWOP. Both McLaurin and Nichols informed Plaintiff that she must have proper medical documentation to support a need for LWOP. *See* ECF Nos. 22-5 at 5 (McLaurin); 32-3 at 50–52 (same), 54 (Nichols). Rather than provide medical documentation, Plaintiff emailed McLaurin (and later added Beck), explaining that it takes time to obtain medical documentation, providing a regulation for their

review, and asking again for three weeks LWOP. ECF No. 22-7. As an annotated argument within an exhibit, Plaintiff argues that the regulation mandates that LWOP be granted for a "disabled veteran to cover an absence for medical treatment related to a service connected disability." *See* ECF No. 32-3 at 54. Plaintiff apparently does not recognize, however, that medical documentation is needed at least in part to determine whether the absence will be for treatment related to a service connected disability. But Nichols understood that need for medical documentation—"Per AFI 36-815 there are different rules based on individual situations and without having proper medical documentation management cannot make the decision you are asking them to make at this time." *Id*. In hopes of obtaining necessary medical documentation, McLaurin approved advance sick leave for Plaintiff to go to a doctor's appointment. ECF No. 22-5 at 5. But he never received anything after the appointment. *Id*.

For these reasons, Plaintiff's reasonable accommodation claim based on her request for LWOP fails. Defendant is entitled to summary judgment on this claim, as well as all other reasonable accommodation claims.

### 3. Harassment or Hostile Work Environment

Plaintiff has pointed to no summary judgment evidence that she experienced actionable harassment or a hostile work environment due to any disability. This case involves the period from mid-August 2012 through February 2013. During that period, Plaintiff commenced her internship with the AF, requested an ergonomic chair, requested to work from home and for LWOP in October 2012, received a poor performance evaluation in November 2012, received criticism in December 2012, and requested LWOP in February 2013. She complains about a lack of dialogue about an ergonomic chair, the delay in obtaining an ergonomic chair, the poor performance review and criticism, as well as the denials of her requests to telework and for LWOP.

In the prior section, the Court found that Plaintiff's reasonable accommodation claims fail.

It now finds that Plaintiff has not stated any actionable harassment or hostile work environment claim based on Defendant's conduct.

After Plaintiff requested an ergonomic chair as a reasonable accommodation, Defendant properly asked for medical documentation. An employer "asking for further medical information" does not support finding harassment. *See Molden v. E. Baton Rouge Par. Sch. Bd.*, 715 F. App'x 310, 317 (5th Cir. 2017) (per curiam). When Plaintiff provided some documentation, a funding issue still prevented the immediate purchase of the chair. As Defendant attempted to resolve the funding issue, Plaintiff instructed her first-level supervisor and Coleman to disregard her request for a chair because the VA was going to get one. Despite that instruction, the AF did obtain funding approval just hours after Plaintiff said to disregard her request. Thus, within two weeks of obtaining medical documentation that the AF deemed sufficient to pursue an ergonomic chair, the AF had cleared the funding hurdle as well.

Nevertheless, further delay resulted from miscommunication, misunderstanding, or simple confusion caused in a bureaucracy by discussions between various Squadron personnel, a commanding Colonel, an outside agency (the VA), and the federal employee. As discussed in the prior section, the subsequent delay was caused by several factors, but it did not render the requested accommodation unreasonable. Defendant, furthermore, engaged in the interactive informal accommodation process in good faith.

Still, issues between Plaintiff and Smith arose through September 2012 resulting in some harsh words to Plaintiff from Smith. And just prior to procurement of a new chair in October, McLaurin denied Plaintiff's temporary request to work from home. Shortly after Plaintiff received an ergonomic chair, she wanted to make a workers' compensation claim and was denied use of sick leave and LWOP from October 30 to November 26, 2012 due to lack of medical documentation. Early November brought a mandatory 90-day performance evaluation of Plaintiff by Smith,

in which Smith indicated that Plaintiff needed significant improvement in most areas. December brought harsh feedback from McLaurin in which he stated he agreed with the feedback that Smith had provided. Beck also agreed with the comments from Smith to Plaintiff on the November performance evaluation. The new year, 2013, brought McLaurin's denial of Plaintiff's request for LWOP and Plaintiff's resignation in February.

"Considered against the record as a whole, this conduct is not the type that courts have found to constitute harassment, and certainly not harassment that is sufficiently severe or pervasive to create a hostile work environment." *Credeur v. La. through Off. of Att'y Gen.*, 860 F.3d 785, 796 (5th Cir. 2017). "The Fifth Circuit has previously held that a poor performance evaluation, even when combined with other incidents, does not give rise to a hostile work environment." *Standley v. Rogers*, 202 F. Supp. 3d 655, 674 (W.D. Tex. 2016) (citing *Kang v. Bd. of Sup'rs of La. State Univ.*, 75 F. App'x 974, 977 (5th Cir. 2003)), *aff'd*, 680 F. App'x 326 (5th Cir. 2017). Likewise, "[c]riticism of an employee's work performance . . . and even threats of termination do not satisfy the standard for a harassment claim." *Credeur*, 860 F.3d at 796. This is particularly so when "the record demonstrates deficiencies in the employee's performance that are legitimate grounds for concern or criticism." *Id.* It is "significant" that the employer's actions were neither physically threatening, nor humiliating, nor even offensive. *See id.*

The evidence in this case shows that Defendant had legitimate grounds for concern or criticism of Plaintiff's performance. There were no threats of termination or even threats of less adverse action. The 90-day performance evaluation carried no consequences to Plaintiff. The program mandated quarterly evaluations for the first year so that interns can obtain feedback to help them in their goal of graduating from the program. McLaurin's feedback was likewise intended to help Plaintiff reach her ultimate goals. While the poor reviews may not have been what Plaintiff expected or thought warranted, the employer's actions were not physically threatening,

humiliating, or offensive. A negative performance review naturally elicits some humiliation. And perhaps some recipients may be offended to some extent by a negative performance review. But such humiliation or offense is not of such nature to give rise to a hostile work environment. It is not sufficiently severe or pervasive. Such conduct is not harassment.

As the Fifth Circuit has emphasized, "[i]t is a simple fact that in the workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or cold shouldering to the level of actionable offense." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003) (citation and internal quotation marks omitted). A supervisor's "insensitive statements do not give rise to a hostile-work-environment complaint," when they are "no more than a few harsh words." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 471 (5th Cir. 2021) (citation and internal quotation marks omitted). Put succinctly, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not suffice to alter the terms and conditions of employment." *Id.* (citation and brackets omitted).

Furthermore, employers may properly refuse employees to work from home when their "policies and practices also point to regular work-site attendance being an essential function of [the] job." *Credeur*, 860 F.3d at 794. Likewise, employers may properly deny a request for LWOP unaccompanied by proper medical documentation. It is not harassment or a hostile work environment to require such employees to work in the office or to provide proper medical documentation for requested leave.

Instead of objectively showing harassment, Plaintiff has only proffered her "own subjective belief" that harassment occurred. This is insufficient. Courts "are not prepared to hold that a subjective belief of discrimination, however genuine, can be the basis of judicial relief." *Elliott v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983).

For these reasons, Plaintiff's claims of harassment and hostile work environment fail.

Defendant is entitled to summary judgment on such claims.

**4. <u>Adverse Employment Action</u>**

Plaintiff identifies three employment actions as adverse actions under the RA: (1) her performance review; (2) comments from McLaurin, and (3) refusals of her requests to telework and for LWOP. She also contends that she was constructively discharged by the refusal to allow her LWOP.

"Under the constructive discharge doctrine, an employee's decision to resign due to intolerable working conditions is tantamount to formal discharge." *Handy v. Brownlee*, 118 F. App'x 850, 855 (5th Cir. 2004) (per curiam) (citing *Pa. State Police v. Suders*, 542 U.S. 129 (2004)). This raises "the objective question: 'Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Id.* (quoting *Suders*, 542 U.S. at 141). "To state a claim for constructive discharge, the former employee must show (1) 'that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign,' and (2) 'that he actually resigned.'" *Sacks v. Tex. S. Univ.*, 83 F.4th 340, 345 (5th Cir. 2023) (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)), *cert. denied*, 144 S. Ct. 2520 (2024)). The constructive discharge doctrine applies in the RA context. *See Handy*, 118 F. App'x at 854–55.

When determining "whether a reasonable person would feel compelled to resign," the Fifth Circuit considers the following factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Sacks*, 83 F.4th at 347 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

Plaintiff does not specifically invoke any of these factors. Her allegations might suggest

factor six is in play, but she points to no summary judgment evidence that the AF or her supervisors engaged in any conduct that was calculated to encourage her to resign. She characterizes the denial of her requests for LWOP as harassment, but the characterization amounts to no more than her own subjective belief, which is insufficient to provide a "basis of judicial relief." *Little v. Republic Ref. Co.*, 924 F.2d 93, 96 (5th Cir. 1991). Plaintiff has no viable constructive discharge claim.

Plaintiff identifies other adverse employment actions—a poor performance review, harsh feedback and comments from McLaurin, and refusals of her requests to telework and for LWOP. The term, "adverse employment action," in the Title VII context, "is a judicially-coined term utilized as shorthand for the statutory phrase compensation, terms, conditions, or privileges of employment." *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 502 (5th Cir. 2023) (en banc). Through *Hamilton*, the Fifth Circuit overturned long-standing precedent that "adverse employment actions consist[ed] of ultimate employment decisions such as hiring, firing, demoting, promoting, granting leave, and compensating." *See Smith v. Kendall*, No. 23-50713, 2024 WL 4442040, at *4-5 (5th Cir. Oct. 8, 2024) (per curiam).

Post-*Hamilton*, an "adverse employment action" encompasses more than just ultimate employment decisions—the term also covers actions that affect the terms, conditions, or privileges of her employment. *See* 79 F.4th at 497. "*Hamilton* both acknowledged that Title VII 'does not permit liability for de minimis workplace trifles,' but also declined to address 'the precise level of minimum workplace harm' necessary to sustain a discrimination claim." *Smith*, 2024 WL 4442040, at *5 (quoting *Hamilton*, 79 F.4th at 505). Still, employees must establish adversity and a non-de minimis injury. *Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 430 (5th Cir. 2023) (per curiam). Subsequently, the Supreme Court has held that, while "an employee must show some harm" from the asserted adverse employment action, "she need not show that the injury satisfies a significance test." *Muldrow v. City of St. Louis*, 601 U.S. 346, 350 (2024). The phrase, "terms or conditions of

employment," requires employees to show that the asserted adverse employment action "brought about some 'disadvantageous' change in an employment term or condition." *Id.* at 354.

*Hamilton* "should be applied" in the ADA (and thus RA) context. *See Stancu v. HRI Lodging/Hilton Garden Inn*, No. 3:23-CV-2566-K-BN, 2024 WL 5294663, at *4 (N.D. Tex. Nov. 20, 2024) (recommendation of Mag. J.) *accepted by* 2025 WL 44272 (N.D. Tex. Jan. 7, 2025). Thus, the Court must be appropriately wary of applying caselaw predating *Hamilton* that address adverse employment actions.

Nevertheless, the Fifth Circuit "has held a low performance evaluation alone is not an adverse employment action." *Johnson v. McDonald*, 623 F. App'x 701, 704 (5th Cir. 2015) (per curiam) (citing *Douglas v. DynMcDermott Petro. Ops. Co.*, 144 F.3d 364, 372 (5th Cir. 1998)). Further, even if the poor performance review "coupled with other tangible effects is an adverse employment action," *see id.*, Plaintiff points to nothing to show what, if any, effect the review had on the terms, conditions, or privileges of her employment. Plaintiff has not shown that her performance review brought about any disadvantageous change to any employment term or condition. Accordingly, under *Hamilton* and *Muldrow*, the review does not qualify as an adverse employment action.

The same analysis applies to McLaurin's feedback and harsh words. The Fifth Circuit "has previously held that 'allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions as discrimination or retaliation." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019) (quoting *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008) (per curiam)), *abrogated in part by Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023). Under *Hamilton* and *Muldrow*, most of these actions may fall away as de minimis workplace trifles. But whether particular conduct "is materially adverse depends upon the circumstances of the particular case." *Burlington N. & Santa*

*Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006). Materiality remains a relevant consideration. Here, because Plaintiff has not shown that McLaurin's feedback or harsh words brought about any disadvantageous change to any employment term or condition, she has not shown that his conduct had any material effect on the terms, conditions, or privileges of her employment. As in *Welsh*, any humiliation Plaintiff may have experienced as a result of McLaurin's feedback and harsh words is merely "an unpleasant workplace experience, not an adverse employment action." 941 F.3d at 826.

As for Defendant denying Plaintiff's requests for LWOP, the Fifth Circuit has previously held that a "single denial of leave is not an adverse employment action when it affects leave on a specific date and time, but not the employee's amount of or right to take leave in general, because a reasonable employee would not have found the action to be materially adverse." *Ogden v. Potter*, 397 F. App'x 938, 939 (5th Cir. 2010) (per curiam) (citing *White*, 548 U.S. at 70). LWOP naturally differs from leave that an employee has accrued. Nevertheless, in this instance, Plaintiff has not shown that any denial of LWOP had any material effect on the terms, conditions, or privileges of her employment. While her employment allowed for LWOP in appropriate circumstances, such leave was contingent on the employee providing required medical documentation. The facts of this case show that Plaintiff did not provide any medical documentation to support her requested LWOP. Accordingly, the denial of such leave did not affect the conditions, terms, or privileges of her employment. She still had the privilege of LWOP so long as she complied with the requirements for obtaining such leave.

Denying Plaintiff's request to telework likewise does not have any affect on any condition, term, or privilege of her employment. She was not hired to work from home. She was not hired on a telework basis. The facts of this case establish that interns in her position did not telework. Thus, under *Hamilton* and *Muldrow*, the denial of the request to telework does not qualify as an adverse

employment action.

In the prior section, the Court has found that the conduct of Defendant was not sufficiently severe or pervasive to constitute harassment or create a hostile work environment. While the Court did not phrase its analysis in terms of altering the terms, conditions, or privileges of her employment, that is ultimately its conclusion. And the Court now directly finds that Defendant's conduct did not rise to the level of altering the terms, conditions, or privileges of her employment. Without an adverse employment action, Plaintiff's retaliation claims fail and Defendant is entitled to summary judgment on such claims.

### 5. **Pretext**

Lastly, Defendant argues that Plaintiff has failed to show that his proffered reasons are pretextual. ECF No. 52 at 26–28. The Court agrees. If the Court were to find that Plaintiff has established a prima facie case of disability discrimination or retaliation, her claims would still fail because Defendant has articulated nondiscriminatory and nonretaliatory reasons for his conduct. Both Smith and McLaurin had legitimate reasons for their feedback and evaluations. McLaurin stated legitimate reasons for denying Plaintiff's requests to telework and for LWOP. Smith stated legitimate reasons for her denial of LWOP.

Because Defendant has stated legitimate nondiscriminatory and nonretaliatory reasons for his employment actions, Plaintiff must show that the proffered reasons are merely a pretext for discrimination or retaliation. For RA retaliation, this means that she must show that her protected act was a but for cause of Defendant's adverse actions. *January v. City of Huntsville*, 74 F.4th 646, 654 (5th Cir. 2023). Similarly, for her RA discrimination claim, she must show that her disability was the but for cause of the Defendant's actions. Plaintiff has not carried her burden to show that Defendant's stated reasons are a pretext for disability discrimination or retaliation.

## VI. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 52) and **DENIES** Plaintiff's Motion to Strike (ECF No. 62). By separate document, the Court will issue a Final Judgment dismissing this action.

**IT IS SO ORDERED this 31st day of March 2025.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**